[Cite as *In re L.C.*, 2022-Ohio-1592.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE:  L.C.                                                    :

                                                               No. 111053
A Minor Child                                                  :

[Appeal by Mother]                                             :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:**  AFFIRMED
**RELEASED AND JOURNALIZED:**  May 12, 2022

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD 19902999

---

### *Appearances:*

Gregory T. Stralka, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Joseph Young, Assistant Prosecuting Attorney, for *appellee.*

MICHELLE J. SHEEHAN, P.J.:

{¶ 1} Appellant mother ("mother" hereafter) appeals from a judgment of the juvenile court granting permanent custody of her child L.C. to the Cuyahoga County Department of Children and Family Services (hereafter "CCDCFS" or "agency"). Our review reflects the juvenile court properly engaged in the statutory analysis set

forth in R.C. 2151.414 and clear and convincing evidence supports the findings made by the court in support of its decision granting permanent custody. Accordingly, we affirm the juvenile court's decision.

**Substantive History and Procedural Background**

{¶ 2}   The child was born on March 2, 2019. She stayed at the hospital until March 14, 2019. On that day, the agency removed the child and filed a complaint alleging the child was abused and dependent and seeking temporary custody of the child. The agency alleged mother tested positive for cocaine, opiates, fentanyl, amphetamines, and marijuana throughout the pregnancy, including the third trimester, and the child was on morphine due to withdrawals. The agency alleged mother's substance abuse interfered with her ability to provide care for the child and, although mother had participated in treatment in the past, she was unable to maintain her sobriety.

{¶ 3}   The trial court granted the agency's request for predispositional temporary custody and subsequently adjudicated the child as dependent and placed the child in the temporary custody of the agency. The temporary custody was extended in March 2020. On July 30, 2020, the agency filed a motion for a second extension of temporary custody and, on October 22, 2020, amended the motion to one for permanent custody.

{¶ 4} The permanent custody matter was scheduled for a trial on October 20, 2021. The record reflects that, three months before the scheduled trial, the agency filed a notice of emergency amendment case plan, requesting the court to terminate

in-person visitations and change them to virtual visitations. Mother objected to the change in visitations. On September 24, 2021, the trial court held a hearing on mother's objection.

**Hearing on Motion to Amend the Case Plan**

{¶ 5} Mother, her counsel, and her guardian ad litem ("GAL") were present at the hearing, as well as the child's father and the child's GAL. Tracy Digney, the social worker assigned to this case, testified for the agency.

{¶ 6} The social worker testified that in August 2020, mother disappeared with the child after an overnight visit at mother's residence, and the police had to be contacted to help locate mother. After the incident, the visitation was changed to two-hour supervised visitation at a public library. However, on October 7, 2020, mother caused a disturbance during a visitation in the library. She repeatedly refused to keep her mask on and yelled at a library patron who looked at her and, as they were leaving, she yelled at everyone passing by that the agency workers were kidnapping her child. Mother then tried to leave with the child in her vehicle. The police had to be called to assist with the situation. After the incident, the library prohibited mother to hold visitations in the library.

{¶ 7} After the incident, the visitations took place at an agency building but mother behaved in a hyper, agitated manner in these visits, which overstimulated the child. The child sometimes appeared to look to the social worker for protection, and it would take her a few days to calm down after these visits.

**{¶ 8}** The social worker also testified that, in the morning of Thanksgiving of 2020, mother came to the foster mother's residence and demanded that the child be returned to her. Mother herself recorded the incident and sent the video to the social worker. The video showed mother talking incoherently outside the foster home, accusing the foster mother to have "kidnapped" her child and claiming she had the paperwork for the child to be returned to her. The police were called to remove mother from the property.

**{¶ 9}** At the hearing, the agency also played a voicemail mother left on the social worker's phone on July 4, 2021. Mother claimed she had a right to the child and threatened to leave with the child. At this point, the agency changed the visitation to a virtual format for the safety of the child and the foster mother. Mother and the child have had several visitations by Zoom since.

**{¶ 10}** The social worker also testified that the agency sought to change the visitations to virtual visits because mother made threats to the foster mother by way of text messages, which included a threat on the foster mother's life and a threat to run away with the child.

**{¶ 11}** The social worker testified that mother had initially made progress with her mental health during the pendency of the custody case but, in recent months, her mental health appeared to be in decline. Mother recently indicated she was no longer participating in the mental health services offered by Signature Health and no longer taking a prescribed mood-stabilizing medication. When the social

worker visited mother in her home, she acted in a bizarre manner — mumbling inaudibly while marching and pacing around in the yard.

{¶ 12} Mother's counsel argued virtual visitations with the child, now two years old, would not be effective. Mother's GAL also cross-examined the social worker on the suitability of the virtual visits for mother. The child's GAL inquired whether mother attended the child's therapy sessions, and the social worker testified that mother did not. The social worker also testified that the child had been diagnosed as being on the autism spectrum but mother did not believe the child needed any therapies. After the hearing, the trial court granted the agency's request for virtual visitations.

**GAL's Reports**

{¶ 13} Throughout the pendency of the case, the child's GAL submitted six written reports. He ultimately recommended a grant of permanent custody.

{¶ 14} On May 6, 2019, the GAL reported that mother visited the child in a public library once a month and began treatment at Signature Health in March 2019. She saw a psychologist for her bipolar disorder, anxiety, and depression and took medications for her opiate addiction. On December 11, 2019, the GAL reported mother visited the child in the library twice a month. He noted mother has complied with most of her case plan but was concerned with her failure to follow directions from the agency's staff and making threats to the caseworker and foster mother. He also noted the child appeared to be upset and anxious after the visitations.

{¶ 15} On March 2, 2020, the GAL reported mother now visited the child twice a week for two hours at mother's home. She began to have a supportive counselor and a parenting counselor during the visitations, and the counselor indicated mother interacted well with the child. The documentation from Signature Health also indicated mother has made progress in counseling. The GAL recommended the agency to commence overnight visitations.

{¶ 16} On August 31, 2020, the GAL reported mother has continued to engage in mental health and substance abuse services through Signature Health; she has maintained sobriety for over a year and continued to take medications for opiate addiction. She has also completed parenting classes. However, despite the substantial progress, mother still failed to acknowledge the child's special needs and failed to consistently attend the child's medical appointments. Mother had overnight visits, but these visits were stopped in August 2020 because mother failed to return the child at the scheduled time and the police were called to locate mother and the child. Mother also consistently sent threatening texts to both the caseworker and the foster mother. The GAL was concerned with mother's mental stability and her failure to recognize the child's special medical needs. He recommended granting the agency's request for an extension of temporary custody.

{¶ 17} On October 4, 2021, the GAL reported that mother started two-hour supervised visitation at a public library, but there was an altercation during one visit and the police were called and the visitation has since changed to virtual visits. The police were also called to the foster mother's home on Thanksgiving of 2020.

Furthermore, mother now would not cooperate with the agency and failed to verify her participation in counseling or compliance with the prescribed medications. The GAL found mother's lack of mental stability and her refusal to acknowledge the child's special medical needs were deeply concerning, and he questioned her ability to take care of herself, let alone the child. He recommended a grant of permanent custody to the agency. On October 8, 2021, the GAL filed his final report, affirming his recommendation.

**Testimony at Permanent Custody Hearing**

{¶ 18} On October 20, 2021, the trial court held a hearing on the agency's motion for permanent custody. Mother was not present even though she had told her counsel she would appear. Her counsel asked for a continuance of the hearing to allow her to be present. The court denied the request. Neither mother nor father was present, but mother was represented by her counsel and her GAL, and father was represented by counsel as well. Tracy Digney; Denise Ramos, the child's physical therapist; and foster mother testified for the agency.

a. **Testimony of Child's Physical Therapist**

{¶ 19} The child's physical therapist, Denise Ramos, testified that the child was diagnosed early on for Torticollis and Hypotonia, which related to weaknesses in muscles and movements, and for delays in adaptive, social, emotional, and gross motor developments. The foster mother was taught how to help the child develop appropriate mobility skills. The child also has a sensory processing disorder, and the foster mother was provided with strategies to help with her nervous system. The

child had to be dressed in compression clothing, and she also wore ankle braces to help with balance and stability. In addition, the child had trouble with chewing and also had reflux issues, and foster mother worked on the child daily to address these issues.

{¶ 20} The therapist testified that mother did not believe the child had any disability; she was participating in a visitation held in the library in October 2019, but was asked by mother to leave. Mother told her that it was "cruel" to make children do the exercises and that her child was not mentally disabled. The therapist also testified about an August 2020 virtual visitation, where mother left within five minutes after greeting the child. Beginning in May 2021, the therapist invited mother and the child's father to attend the therapy sessions but neither ever attended. The therapist was very concerned with the parents' lack of participation in the services addressing the child's special needs.

### b. Testimony of Foster Mother

{¶ 21} The foster mother testified that the child was placed in her home after leaving the hospital's special care unit. She had other foster children placed in her home but they have all been reunified with their biological parents.

{¶ 22} The child goes to physical therapy, occupational therapy, feeding therapy, and speech therapy weekly. In addition, the foster mother was provided various techniques and strategies to use at home. The child needs special cues and input throughout the day for proper physical development and regulation of emotions. Also, because of the autism and sensory disorder issues, the child

struggles whenever there is a change in routine and she needs to be closely monitored in those situations; sometimes she could cope with it but on occasions she would self-harm, such as pulling her hair or hitting her head on objects.

{¶ 23} The foster mother also testified that during the overnight visits, mother would give wrong dosages of medications to the child. The child was exposed to cigarette smoking during these visits, which caused her to cough and wheeze and required the use of an inhaler as soon as she left the mother's home.

{¶ 24} The foster mother testified that mother was not receptive to strategies used to help the child with her special needs. On one occasion mother said to her that it was her baby and "she was going to do what she wanted to do." When the visits became virtual at one point due to the Covid pandemic, mother began to leave threatening calls and texts in the foster mother's Google Voice number, saying the custody case was closed and demanding the foster mother to bring the child to her. One of the voicemails mentioned mother has an uncle who was a sniper.

{¶ 25} During the foster mother's testimony, the agency introduced exhibit Nos. 2A, 2B, 2C, and 2D, which are emails mother sent to both the foster mother and social workers between July and August 2020. The emails repeatedly state that the custody case was over and the child should be returned to mother.

{¶ 26} On August 12, 2020, the foster mother and the social worker went to mother's residence to pick up the child after an overnight visitation. Mother and the child were not there. Mother left the child's diaper bag and her nebulizer, as well as

a photo book of the child made by mother — submitted as the state's exhibit No. 3 — on the porch.

{¶ 27} The photo book contains screenshots of the child from the virtual visitations and handwritten messages in the book such as: "Just sorry, I can't be patient much more [.] * * * I fear your family will only continue 2 keep trying 2 take her. So I am reuniting with her now and I wish you luck but please refrain from seeking my child further." The book also included a certificate of mother's completion of a parenting program. The police were called, and mother and the child were located nearby.

{¶ 28} In another incident, the police were called by a nurse during the child's one-year checkup, because mother caused a disturbance at the doctor's office. The police were also called during a visit to the hospital in July 2019 for the child to be treated for a respiratory virus. Mother refused to follow the instructions of the medical staff; she ran away when the police were trying to remove her but then returned to the scene 30 minutes later dressed in a hospital gown.

{¶ 29} On Thanksgiving of 2020, mother showed up at the foster mother's residence unexpectedly, telling the foster mother that she had won the custody case and demanding the return of the child. The police were called to remove mother from the property. Foster mother was concerned about the incident due to the recent, frequent threatening messages from mother. The state introduced exhibit No. 6, which was a screenshot of a long text message the foster mother received from

mother, which stated, "That lil girl best be brought home. * * *  I am making this a fair warning * * *."

{¶ 30} Regarding the interaction between mother and the child, the foster mother testified that the child would "freeze" or "zoned out" when mother was present during doctors' appointments.  She recalled a physical therapy session where mother was observing virtually and the child "instantly froze" when she heard mother's voice.  During virtual visits, which mother did attend on most occasions, the child often did not want to sit and interact with mother; she would say "no, no, don't talk to me," "get away from me," or "I'm scared."

{¶ 31} Regarding the child's father, the foster mother recalled a conversation where he expressed regrets about the child's condition.  While he had wanted the child to be reunified with mother, sometime in September 2021, however, he told the foster mother it may be best for the child to stay with her.

**c. Testimony of Social Worker**

{¶ 32} Tracy Digney, the social worker in this case, testified mother's case plan included substance-abuse treatment, mental health treatment to address her bipolar and anxiety disorder, and parenting classes.  She participated in these programs in 2019.  In 2020, when the services turned virtual due to the pandemic, her participation became sporadic.

{¶ 33} In a virtual meeting in July 2020 to address the agency's concerns with her behavior, such as sending threatening messages and video to the foster mother, mother left within five minutes.  The agency was very concerned with

mother's continuous and repeated insistence that she had custody of the child and that her child was "kidnapped." The social worker referred her for a mental health assessment with the court's clinic but mother refused to participate. In 2021, she was noncompliant regarding her mental health services. Mother admitted she was no longer taking two medications prescribed for her mood issues. In the social worker's observation, mother's behavior and mental health have not improved significantly since the beginning of the case.

{¶ 34} Mother acknowledged she had a long history of substance abuse but insisted the child was not exposed to drugs during her pregnancy. She completed an intensive outpatient substance abuse program but did not participate in any additional service. She had attended the 12-Step meetings but stopped attending when the meetings became virtual. She has not submitted to urine screens since October 2020, and the social worker was not able to verify her sobriety. Mother cited a lack of transportation but declined the agency's offer of bus tickets. In August 2021, the social worker went to see mother in her home, and mother appeared disheveled and unkept, and her speech was very slurred.

{¶ 35} Mother participated in parenting services, receiving a certificate for completing the Nurturing Parenting Program in February 2020, but, in 2021, she stopped participating because she did not want anyone telling her how to parent her child. The visitation initially progressed from two-hour visits in a library to overnight visits, but they were held in the public library after the August 2020 incident.

{¶ 36} The visits then took place at the agency's building. The child did well on some visits, but on other occasions, she would scream and not want to see mother. At the last of such visits, the social worker told mother the child was going to preschool. Mother objected to the idea, shouting "White Power. White Power" at the social worker. The child appeared to be unnerved by the commotion and struggled with her behaviors the next day. In July 2021, the agency changed the visitations to virtual visits due to the threat made by mother, but mother did not participate in them.

{¶ 37} Mother does not believe the child has any medical issues or special needs, claiming the agency "made them up" and indicated she will not participate in any services for the child.

{¶ 38} Mother presented no witnesses. The GAL recommended that the permanent custody be granted. At the conclusion of the hearing, the court granted the agency's motion for permanent custody. Mother filed the instant appeal.

{¶ 39} On appeal, mother raises the following two assignments for our review:

> I.     The Department of Children and Family Services failed to present sufficient, admissible evidence to establish a basis upon which permanent custody could be granted.
>
> II.    Appellant was denied of her right to effective assistance of counsel when trial counsel failed to object to evidentiary materials that were be [sic] used to grant permanent custody.

**Standard of Review and Permanent Custody Statute**

{¶ 40} We begin our analysis with the recognition that a parent's right to raise a child is an essential and basic civil right. *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997). The parent's interest, however, is "'always subject to the ultimate welfare of the child.'" *In re M.J.M.*, 8th Dist. Cuyahoga No. 94130, 2010-Ohio-1674, ¶ 15, quoting *In re B.L.*, 10th Dist. Franklin No. 04AP-1108, 2005-Ohio-1151, ¶ 7.

{¶ 41} Under Ohio's permanent custody statute, R.C. 2151.414, the juvenile court's judgment granting permanent custody must be supported by clear and convincing evidence. We will not reverse a juvenile court's termination of parental rights and award of permanent custody to an agency unless the judgment is not supported by clear and convincing evidence. *See, e.g., In re N.B.*, 8th Dist. Cuyahoga No. 101390, 2015-Ohio-314, ¶ 48, and *In re M.J.*, 8th Dist. Cuyahoga No. 100071, 2013-Ohio-5440, ¶ 24.

{¶ 42} R.C. 2151.414 sets forth a two-prong analysis to be applied by a juvenile court in adjudicating a motion for permanent custody. R.C. 2151.414(B). Under the statute, the juvenile court is authorized to grant permanent custody of a child to the agency if, after a hearing, the court determines, by clear and convincing evidence, that any of the five factors under R.C. 2151.414(B)(1)(a) to (e) exists and, furthermore, permanent custody is in the best interest of the child under the factors enumerated in R.C. 2151.414(D)(1).

{¶ 43} On appeal, mother does not raise any argument regarding the trial court's best-interest-of-the-child finding. She only challenges the court's finding under the first prong. Accordingly, we limit our review in this appeal to the first prong of the permanent custody analysis.

**First Prong: R.C. 2151.414(B)(1)**

{¶ 44} Under the first prong of the permanent-custody analysis, the juvenile court is to determine if any of the following factors exists: whether the child is abandoned (R.C. 2151.414(B)(1)(b)); whether the child is orphaned and there are no relatives of the child who are able to take permanent custody (R.C. 2151.414(B)(1)(c)); whether the child has been in the temporary custody of public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period (R.C. 2151.414(B)(1)(d)); whether another child of the parent has been adjudicated as abused, neglected, or dependent on three separate occasions (R.C. 2151.414(B)(1)(e)); or, when none of these factors apply, whether "the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents." (R.C. 2151.414(B)(1)(a)).

{¶ 45} In this case, the trial court found the presence of the R.C. 2151.414(B)(1)(d) factor — that L.C. has been in the temporary custody of the agency for 12 or more months out of a consecutive 22-month period. As the record reflects, the child has been in the temporary custody of the agency for over 18 months at the time the agency filed for permanent custody.

{¶ 46} Although not necessary, the trial court made the additional finding pursuant to (B)(1)(a) — that the child cannot be placed with either mother or father within a reasonable time or should not be placed with either mother or father.

{¶ 47} For the (B)(1)(a) factor, R.C. 2151.414(E) enumerates 15 factors for the court to consider. Pursuant to R.C. 2151.414(E), if the court determines, by clear and convincing evidence, that one or more of the (E)(1)-(15) factors exist, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. Pursuant to the statute, the trial court is only required to find one of the R.C. 2151.414(E) factors present in order to enter a finding that a child cannot or should be placed with a parent. *See, e.g., In re D.P.*, 8th Dist. Cuyahoga No. 110379, 2021-Ohio-3672, ¶ 27, and *In re Ca.T.*, 8th Dist. Cuyahoga No. 108969, 2020-Ohio-579, ¶ 27.

{¶ 48} In this case, the trial court found the presence of (E)(1), (2), (4), (9), (14), and (15). The pertinent portion of R.C. 2151.414(E) states as follows:

(E) In determining * * * whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, * * * that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the

court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

(2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing * * *;

* * *

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;

* * *

(9) The parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan issued * * *.

* * *

(14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.

(15) The parent has * * * caused or allowed the child to suffer neglect as described in section 2151.03 of the Revised Code, and the court determines that the seriousness, nature, or likelihood of recurrence of the abuse or neglect makes the child's placement with the child's parent a threat to the child's safety.

{¶ 49} Our review of the record shows clear and convincing evidence supports the trial court's R.C. 2151.414(E) findings. Under the first assignment of

error, mother specifically challenges the finding made by the trial court under R.C. 2151.414(E)(1) (parent fails to substantially remedy the conditions causing the child's removal) and (E)(2) (the chronic mental illness or chemical dependency is so severe that it makes the parent unable to care for the child).

{¶ 50} Mother argues there is insufficient evidence regarding the trial court's finding under (E)(1) and (E)(2). Specifically, mother argues the agency failed to present expert or physician testimony that she has a chronic mental illness severe enough to affect her ability to parent and that there was no evidence that mother had continued to test positive for illegal substance after the initial complaint was filed.

{¶ 51} The record reflects that the child was placed with the agency since birth. Mother's mental health issues, reflected repeatedly in her erratic behavior, substantially affected her ability to parent the child. Despite the programs and services provided to her to address her substance abuse and mental health issues, mother, after some initial progress in 2019, failed to substantially remedy her problems and to demonstrate she was able to properly care for the child. She failed to take the prescribed medications and failed to continue to engage in the mental health services. She also failed to establish verifiable sobriety, and on one occasion, the social worker observed her speech to be slurred and her appearance unkempt when visiting her at her home.

{¶ 52} Mother argues the agency was required to present an expert to testify to her mental health. Regarding the necessity of expert testimony in a permanent

custody case, in *In re B.P.*, 8th Dist. Cuyahoga Nos. 107732 and 107735, 2019-Ohio-2919, appellant parent raised the same claim, arguing that no expert testimony was offered regarding the extent of her mental health condition and, therefore, the agency failed to establish that she suffered from a chronic mental illness of such severity that she could not parent her children. This court held that expert testimony is not required for a finding under R.C. 2151.414(E)(2). *Id.* at ¶ 14, citing *In re E.S.*, 1st Dist. Hamilton Nos. C-100725 and C-100747, 2011-Ohio-586, ¶ 17-18, and *In re Ross*, 11th Dist. Geauga No. 2003-G-2551, 2004-Ohio-3684, ¶ 76-77.

{¶ 53} Our review indicates the trial court engaged in the required analysis and its findings under R.C. 2151.414(B)(1) and (E) are supported by clear and convincing evidence contained in the record. The first assignment of error is without merit.

**Ineffective Assistance of Counsel**

{¶ 54} Under the second assignment of error, mother argues her trial counsel provided ineffective assistance of counsel for failing to object to the admission of certain exhibits introduced by the agency.

{¶ 55} We first note that an indigent parent is entitled to the effective assistance of appointed counsel when the state seeks to terminate her parental rights. *In re A.C.*, 8th Dist. Cuyahoga No. 99057, 2013-Ohio-1802, ¶ 45. "'[T]he test for ineffective assistance of counsel used in criminal cases is equally applicable in actions seeking to force the permanent, involuntary termination of parental rights.'"

*Id.*, quoting *In re P.M.*, 179 Ohio App.3d 413, 2008-Ohio-6041, 902 N.E.2d 74, ¶ 15 (2d Dist.).

{¶ 56} To establish a claim of ineffective assistance of counsel, mother must show that her trial counsel's performance was deficient in some aspect of the representation and that deficiency prejudiced her defense. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

{¶ 57} Here, mother argues specifically that she did not receive effective assistance of counsel because her counsel failed to object to the following exhibits: exhibit No. 2A-D (email sent from mother to the social worker and the foster mother, with the exception of 2D, which was sent to mother and other agency employees); exhibit No. 3 (a photo book of the child); exhibit No. 4 (the video made by mother depicting her talking outside the foster's mother's residence); exhibit No. 5 (a letter dated October 8, 2020, from a branch manager of Cuyahoga County Public Library addressed to mother banning her presence from the county libraries); exhibit No. 6 (text message from mother to the foster mother); and exhibit No. 7 (voicemail from mother left on the social worker's phone). Mother claims these exhibits were inadmissible because there was no foundational testimony regarding their origin and authenticity. Specifically, she argues it was not established that she was the one creating or sending the content of these exhibits.

{¶ 58} Evid.R. 901(A) states that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent

claims." "Authentication or identification lays the foundation for admissibility of particular evidence." *State v. Jackson*, 12th Dist. Fayette No. CA2011-01-001, 2011-Ohio-5593, ¶ 1, citing Evid.R. 901(A), Staff Notes.

{¶ 59} This court has held that the threshold standard for authenticating evidence under Evid.R. 901(A) is low and the rule does not require conclusive proof of authenticity, only sufficient foundational evidence for the trier of fact to conclude that the evidence is what its proponent claims it to be. *State v. Inkton*, 2016-Ohio-693, 60 N.E.3d 616, ¶ 73 (8th Dist.). "[T]he authentication requirement can be satisfied by the '[t]estimony of a witness with knowledge * * * that a matter is what it is claimed to be.'" *State v. Primous*, 2020-Ohio-912, 152 N.E.3d 1002, ¶ 20 (8th Dist.), quoting Evid.R. 901(B)(1).

{¶ 60} Furthermore, "'in most cases involving electronic print media, i.e., texts, instant messaging, and e-mails, the photographs taken of the print media or the printouts of those conversations are authenticated, introduced, and received into evidence through the testimony of the recipient of the messages.'" *Id.* at ¶ 21, quoting *State v. Roseberry*, 197 Ohio App.3d 256, 2011-Ohio-5921, 967 N.E.2d 233, ¶ 75 (8th Dist.).

{¶ 61} Here, the transcript reflects that several of these exhibits were authenticated by the foster mother. She testified that she personally received them from mother: the emails (exhibit No. 2A-D) were sent from mother's email address to the foster mother's email address; mother left the photo book (exhibit No. 3) with the child's diaper bag for foster mother when mother disappeared with the child

after an overnight visit; and the text message (exhibit No. 6) was sent by mother to the Google Voice number created by the foster mother for the purposes of communicating with mother.

{¶ 62} The remaining exhibits were authenticated by the social worker. She testified that mother sent her the video she recorded of herself outside the foster mother's residence on Thanksgiving of 2020 (exhibit No. 4), and mother left the voicemail (exhibit No. 7) on her work landline. The social worker also testified that the letter from a library manager addressed to mother (exhibit No. 5) was handed by the library staff to mother when the agency and mother showed up for a visitation and the social worker was also given a copy of the letter.

{¶ 63} These witnesses had personal knowledge of the exhibits. Under the low-threshold standard, these exhibits were sufficiently authenticated by the witnesses' testimony. Counsel's performance was not defective for not objecting to admissible evidence. The second assignment of error is without merit.

{¶ 64} While we recognize the paramount right of parents to raise their children, *In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990), the parents' rights are not absolute. *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 40. Our review of the record reflects clear and convincing evidence in support of the trial court's granting of permanent custody of the child to the agency. Accordingly, we affirm its judgment.

{¶ 65} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


_____
MICHELLE J. SHEEHAN, PRESIDING JUDGE

EILEEN T. GALLAGHER, J., and
CORNELIUS J. O'SULLIVAN, JR., J., CONCUR