[Cite as *In re D.H.*, 2022-Ohio-2780.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE D.H., ET AL.                                 :
                                                   :                 No. 111323
Minor Children:
                                                   :
[Appeal by K.H., Mother]                           :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** August 11, 2022

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD-19903487, AD-19903488,
AD-19903489, and AD-19903490

---

### *Appearances:*

Michael E. Stinn, *for appellant*.

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Joseph C. Young, Assistant Prosecuting
Attorney, *for appellee*.

MARY J. BOYLE, J.:

{¶ 1}     Appellant, K.H. ("Mother"), appeals from an order of the Cuyahoga County Court of Common Pleas, Juvenile Division, awarding permanent custody of her four sons, D.H. (d.o.b. Dec. 1, 2007), A.H (d.o.b. Jan. 16, 2010), Q.H. (d.o.b. Apr. 6, 2012), and K.H. (d.o.b. Dec. 11, 2016) (collectively, "children"), to appellee, the

Cuyahoga County Department of Children and Family Services ("CCDCFS" or "agency"). For the reasons set forth below, we affirm the juvenile court's judgment.

## I. Background

{¶ 2} On December 28, 2018, CCDCFS filed a complaint in the juvenile court, alleging that the children were neglected and dependent and requesting predispositional custody (Case Nos. AD18915778-81). The children were committed to the agency's predispositional custody on January 18, 2019. Subsequently, the agency dismissed the complaint because the cases could not be resolved within the 90-day statutory timeframe.

{¶ 3} The agency refiled the complaint on March 25, 2019 (Case Nos. AD19903487-90). The complaint alleged that Mother failed to ensure that D.H., A.H., and Q.H. regularly attended school;[1] Mother has older children who were adjudicated neglected due in part to educational neglect (Case Nos. AD02902607-09); and Mother does not have stable and appropriate housing because she and the children were temporarily residing with a relative and a total of three adults and nine children were living in the home.

{¶ 4} The complaint also alleged that the father of A.H., M.T., established paternity but is currently incarcerated for felonious assault, discharging a firearm at or into a habitation, and having weapons while under disability; the father of Q.H., N.W., established paternity but is currently incarcerated for felonious assault, having a weapon while under disability, and domestic violence; the alleged father of

---

[1] K.H. was not school age when the agency filed its complaint.

K.H., M.E., is incarcerated for involuntary manslaughter, corrupting another with drugs, drug trafficking, possession of criminal tools, and attempted failure to comply; the alleged father of D.H., J.M., failed to establish paternity; and the alleged father of D.H. and K.H., John Doe, failed to establish paternity and failed to support, visit, or communicate with D.H. and K.H. since birth. On March 25, 2019, the juvenile court granted the agency's second request for predispositional custody of the children.

{¶ 5} At a subsequent hearing, Mother stipulated to the allegations in the complaint, the children were adjudicated neglected and dependent, and following the dispositional hearing, the children were committed to the temporary custody of CCDCFS. A case plan was developed that included mental-health and substance-abuse assessments and periodic drug screens for Mother; provision for the children's regular attendance at school and completion of assignments; intervention for D.H. following behavioral concerns and multiple school suspensions; intervention for K.H. to correct cognitive delays; and provision for housing and basic needs, with the goal of reunification.

{¶ 6} On November 25, 2019, the agency filed a motion for the first extension of temporary custody, stating that while Mother had completed mental-health and substance-abuse assessments, she still had not obtained stable housing. On January 23, 2020, CCDCFS filed a semiannual review, stating that D.H.'s behavior disrupted the children's placement with a relative, after which D.H. was placed at the New Beginnings Residential Treatment Center in Youngstown, Ohio

("New Beginnings") and A.H., Q.H., and K.H. were placed in foster care. The juvenile court granted the agency's motion for the first extension of temporary custody on February 6, 2020.

{¶ 7} On May 14, 2020, the agency filed a motion for the second extension of temporary custody of D.H., stating that D.H. continued to struggle with behavior problems and needed more time to complete his treatment before being discharged from New Beginnings. However, the agency filed motions to terminate temporary custody of A.H., Q.H., and K.H., stating that Mother had substantially complied with the case plan by engaging in services to address concerns with substance abuse, mental health, and housing. The agency also requested protective supervision of A.H., Q.H., and K.H. because Mother had not yet completed all the objectives of the case plan. On August 5, 2020, the agency filed an updated semiannual review, stating that Mother was not involved in the children's schooling; sent the children home without showering, eating, and often exhausted from staying up late during weekend visits; and refused to participate in D.H.'s therapy. On August 27, 2020, following D.H.'s release from residential treatment, the agency filed a motion to amend its second extension of temporary custody to a motion to terminate temporary custody of D.H. and, consistent with its motion to terminate temporary custody of A.H., Q.H., and K.H., requested protective supervision of D.H. On October 14, 2020, the juvenile court granted the agency's motion to terminate temporary custody of the children and the children were returned to Mother with protective supervision by CCDCFS.

**{¶ 8}** On November 20, 2020, the children were again removed from Mother's custody pursuant to an ex parte telephonic order issued by the juvenile court. On November 23, 2020, the agency filed a motion for immediate emergency temporary custody of the children pending a hearing on the agency's motion to modify protective supervision to temporary custody. The agency attached to its motion an affidavit of CCDCFS caseworker Shannon Gallagher ("caseworker"), alleging that on November 18, 2020, a month after the children were reunited with Mother, Mother left Q.H. and K.H. with an "inappropriate caregiver," and K.H. was shot with a gun. The caseworker also alleged that another child was shot and killed in Mother's home months earlier in August 2020. The caseworker further alleged that Mother "minimized the severity" of both shootings, "failed to follow through with recommended outpatient psychiatry services for D.H.," and none of the children's fathers or alleged fathers were able to provide care for the children. On November 24, 2020, the juvenile court granted the agency's motion for emergency temporary custody, and three months later, on February 24, 2021, granted the agency's motion to modify protective supervision to temporary custody.

**{¶ 9}** On May 4, 2021, the agency filed a motion to modify temporary custody to permanent custody of the children to CCDCFS. The agency attached to this motion an affidavit of the caseworker, alleging that the children were in agency custody more than 12 months of a consecutive 22-month period; Mother refused to submit to drug screening despite the agency's concerns about her substance abuse; and Mother failed to provide a safe home for the children, refused to participate in

case planning services, and had her parental rights terminated with respect two older siblings of the children. The caseworker also alleged that the children's fathers or alleged fathers were either incarcerated or unwilling to care for the children, and the agency could not identify any relatives who were willing or able to provide alternative permanent placement for the children. The juvenile court held a hearing on the motion on January 26, 2022, at which the following evidence was adduced.

{¶ 10} Dr. Douglas Waltman ("Dr. Waltman"), psychologist and consultant at the juvenile court's diagnostic clinic, testified that the agency referred Mother to him for a psychological evaluation on December 21, 2021. Dr. Waltman's summary report of this evaluation was admitted into evidence. Dr. Waltman testified that the evaluation included a review of Mother's relationship, employment, mental-health, and substance-abuse histories; a diagnostic interview with Mother; and a battery of psychological testing. Dr. Waltman testified that he did not recommend services for Mother because he could not confirm the presence of a diagnosable mental-health or substance-abuse disorder but added that Mother's defensive posture during the evaluation could have presented a "false negative." Dr. Waltman testified to the following from his report:

> [Mother] has a documented history of denial, minimization and externalization of blame related to her parenting problems. This coping pattern was on full display at the current evaluation and corroborated by psychological testing. She did not take any responsibility for losing her children and regards the removal of her children as unwarranted. Psychological testing indicates she does not take responsibility for her actions and copes with problems through an overuse of denial, suppression, repression, minimization, externalization of blame, rationalization, and projection. She has little

insight into herself or how her behavior affects others. Because of this coping pattern, she is not likely to exercise good judgment regarding her children's care or needs. She is very likely not to recognize problems and dangers her children face and consequently will not act on them in an appropriate manner.

Dr. Waltman testified that Mother claimed not to know how K.H. was shot in her home or why the agency removed the children following the shooting, and this failure to accept responsibility for providing a safe home for the children, coupled with her history of noncompliance, did not make Mother amenable to treatment.

{¶ 11} The caseworker testified that when the children were originally removed in January 2019, D.H. was at first placed with his alleged father, J.M., but J.M. could not manage D.H.'s "extreme behavior" and D.H. was subsequently removed. Since then, J.M. has had no contact with D.H. and expressed his wish that D.H. be placed with a nice family. The caseworker testified that A.H.'s father, M.T., attended one hearing associated with custody proceedings in 2019 but expressed no interest in having A.H. placed with him and discontinued contact with the caseworker. The caseworker testified that although M.T. talks with A.H. by phone on a "semiregular basis," he provided no care for A.H. and is now incarcerated. The caseworker testified that Q.H.'s father, N.W., and K.H.'s alleged father, M.E., have had no contact with Q.H. and K.H. and are now incarcerated. The caseworker testified that she searched for paternal relatives, but they had criminal histories, expressed no interest in placement, or did not realize they were related to the father or alleged father.

{¶ 12} The caseworker further testified that the children were originally removed from Mother because of the agency's concerns about educational neglect, lack of stable housing, and failure to meet the children's basic needs. The caseworker stated that Mother initially complied with the agency's referral for housing assistance and mental-health and substance-abuse evaluations. The caseworker testified that Mother tested positive for marijuana and amphetamines in March 2019, and following her referral to a substance-abuse counselor, Mother was recommended for intensive outpatient treatment. The caseworker testified that Mother minimally complied with periodic drug screens because she did not meet the agency's requirement that she complete the drug screens within 24 hours, to rule out the possibility of flushing and inaccurate results. The caseworker added that the agency treats the failure to complete a drug screen within 24 hours as an automatic positive. The caseworker testified that although Mother did not complete the recommended intensive outpatient treatment and the agency had lingering concerns about her substance abuse, the juvenile court ordered the drug screens removed from the case plan because Mother's drug tests were negative.

{¶ 13} The caseworker testified that based on Mother's meeting these objectives of her case plan, the agency reunited the children with Mother in October 2020, to give her an opportunity to meet the children's educational and basic needs under the agency's protective supervision. The caseworker stated that prior to the children's reunification with Mother, the children would return from overnight visits with Mother without having completed homework assignments. The

caseworker stated that on these occasions, Mother would claim that she did not know that the children had any homework even though the caseworker repeatedly informed Mother that the children were assigned homework before their visit. The caseworker testified that the children were also in counseling, D.H. had been taking medication to help him manage his aggression following diagnoses for oppositional defiant disorder and PTSD, and the children had some dental issues that needed to be addressed, including tooth extractions. These were among the agency's lingering concerns when the children were reunited with Mother.

{¶ 14} The caseworker testified that the children's reunification with Mother ended a month later when the youngest child, K.H., was shot in Mother's home. The caseworker added that the bullet grazed K.H.'s buttocks and struck him in his foot. The caseworker testified that Mother had left the children in the care of one of her adult children and was not home at the time. The caseworker stated that Mother insisted that the bullet entered the home during a drive-by shooting, but the police who investigated the shooting concluded that the bullet was fired inside the home; that the gun belonged to Mother's nephew, M.B., who was responsible for the shooting; and that M.B. had gang affiliation and a warrant for his arrest for attempted murder and felonious assault. The caseworker testified that following the shooting, she expressed her concern about M.B.'s presence in the home, and Mother replied that M.B. is family, family is welcome in her home anytime, and the police were unfairly targeting M.B.

{¶ 15} Following the shooting and the children's removal, the juvenile court ordered Mother to complete another mental-health evaluation. The caseworker testified that the agency initially referred Mother for evaluation in November 2020, but Mother did not complete that evaluation, the referral lapsed, the agency again referred Mother in November 2021, and Mother was finally evaluated by Dr. Waltman in December 2021. The caseworker testified that in February 2021, she received what appeared to be a pocket-dial call from Mother around 4:30 a.m., and the voicemail indicated that Mother was at a party. The caseworker recalled that when she asked Mother about the party, Mother replied that she is an adult, can party whenever she wants, and alcohol is not illegal. The caseworker testified that Mother has an unresolved citation for OVI from 2016 and a warrant for failure to appear. The citation and docket for that case were admitted into evidence. The caseworker testified that she asked Mother to complete a drug screen, but Mother refused. The caseworker added that during a visit to Mother's home in June 2021, she observed a bong sitting on Mother's kitchen counter, and when she asked Mother about the bong, Mother denied that it was hers and once more refused to submit to a drug screen. The caseworker stated that Mother lives alone, and even if the bong did not belong to her, there was still a concern that Mother allowed drug use in her home.

{¶ 16} The caseworker testified that the children are currently placed in the same foster home, where their educational and other basic needs are being met. The caseworker added that Q.H. has also developed a strong relationship with an

intervention specialist at his school with whom he has extended visits and generally seeks to avoid interacting with his brothers because they bully him. The caseworker stated that the agency has retained the goal of reunification with Mother but seeks stable permanent placement for the children. The caseworker testified that Mother's attitude toward the agency and its referrals remained the same despite the agency's serious concerns about the children's safety. The caseworker testified that when the agency had reunited the children with Mother in October 2020, it was not aware that a child had been shot and killed in Mother's home just months before, and because Mother refused to act on the agency's concerns about the children's safety following the shooting of K.H., it added a concurrent plan of permanent custody.

{¶ 17} Gail Nanowsky, the children's Guardian ad Litem ("GAL"), testified that the children wished to return to Mother. The juvenile court asked the GAL to place her recommendation on the record. The GAL testified that she recommended permanent custody as being in the children's best interest because Mother does not appreciate the danger in which she has placed the children, is not invested in the children's education, has allowed the children's medical and dental issues to go untreated, and does not follow through concerning the children's care.

{¶ 18} On February 2, 2022, the juvenile court granted permanent custody of the children to CCDCFS. The court found that the children were in the temporary custody of the agency for 12 or more months of a consecutive 22-month period, and despite reasonable case planning and diligent efforts to assist Mother, she has failed

to substantially remedy the conditions that caused the children's removal. The court found that Mother suffers from "chronic mental illness and chemical dependency so severe that it makes [her] unable to provide an adequate, permanent home for the child[ren] at the present time and, as anticipated, within one (1) year after the Court holds the hearing in the matter." The court found that Mother has demonstrated lack of commitment to providing a safe home for the children, as evidenced by her unwillingness to complete the case plan and refusal to keep dangerous family members from her home after an individual was shot and killed in her home in August 2020, and K.H. was shot in her home in November 2020, after Mother left him under the supervision of other family members.

{¶ 19} The court further found that Mother did not complete or would not benefit from the services offered to her. The court found that the children cannot be placed with their fathers or alleged fathers due to their incarceration, unwillingness to provide for, demonstrated lack of commitment to, or abandonment or neglect of the children. The court found that the children could not be placed with Mother or their respective fathers or alleged fathers within a reasonable time or should not be placed with them, that the children's continued residence in or return to Mother's home would be contrary to their best interest, and that an award of permanent custody to CCDCFS was in their best interest.

{¶ 20} It is from this judgment that Mother now appeals, raising the following three assignments of error for review.

**Assignment of Error One:** The trial court abused its discretion in finding that permanent custody was in the best interest of the children. Therefore, the trial court's orders granting permanent custody should be reversed.

**Assignment of Error Two:** CCDCFS did not prove by clear and convincing evidence that the children could not be returned to their mother within a reasonable time. Therefore, the trial court's orders granting permanent custody to CCDCFS should be reversed.

**Assignment of Error Three:** The children's mother received ineffective assistance of counsel such that the trial court's orders granting permanent custody should be reversed.

## II. Law and Analysis

{¶ 21} In her first and second assignments of error, Mother argues that the juvenile court erred in finding that permanent custody is in the children's best interest because the agency failed to prove the factors enumerated in R.C. 2151.414(E)(1), (2), and (4) by clear and convincing evidence. The agency argues that the juvenile court's findings are supported by the weight of the evidence.

{¶ 22} A juvenile court's judgment in child custody cases "is subject to reversal only upon a showing of abuse of discretion." *In re A.J.*, 148 Ohio St.3d 218, 2016-Ohio-8196, 69 N.E.3d 733, ¶ 27, citing *Davis v. Flickinger*, 77 Ohio St.3d 415, 417, 674 N.E.2d 1159 (1997).

{¶ 23} We recognize that "[t]ermination of parental rights is an alternative of last resort but is sanctioned when necessary for the welfare of a child." *Id.* at ¶ 7, citing *In re Wise*, 96 Ohio App.3d 619, 624, 645 N.E.2d 812 (9th Dist.1994). Before a court may terminate parental rights and award permanent custody of a child to the proper agency, it must determine by clear and convincing evidence that (1) one of

the factors enumerated in R.C. 2151.414(B)(1)(a)-(e) applies, and (2) an award of permanent custody is in the child's best interest. R.C. 2151.414(B).

{¶ 24} "'Clear and convincing evidence' is evidence that 'will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established.'" *In re C.B.*, 8th Dist. Cuyahoga No. 92775, 2011-Ohio-5491, ¶ 28, quoting *Cross v. Ledford*, 161 Ohio St. 469, 477, 120 N.E.2d 118 (1954). "Where clear and convincing proof is required at trial, a reviewing court will examine the record to determine whether the trier of fact had sufficient evidence before it to satisfy the requisite degree of proof." *In re T.S.*, 8th Dist. Cuyahoga No. 92816, 2009-Ohio-5496, ¶ 24, citing *State v. Schiebel*, 55 Ohio St.3d 71, 74, 564 N.E.2d 54 (1990).

{¶ 25} "'An appellate court will not reverse a juvenile court's termination of parental rights and award of permanent custody to an agency if the judgment is supported by clear and convincing evidence.'" *In re J.M-R.*, 8th Dist. Cuyahoga No. 98902, 2013-Ohio-1560, ¶ 28, quoting *In re Jacobs*, 11th Dist. Geauga No. 99-G-2231, 2000 Ohio App. LEXIS 3859, 11 (Aug. 25, 2000), citing *In re Taylor*, 11th Dist. Ashtabula No. 97-A-0046, 1999 Ohio App. LEXIS 2620 (June 11, 1999); *see In re AR.S.*, 2021-Ohio-1958, 174 N.E.3d 28 (8th Dist.).

### A. The R.C. 2151.414(B)(1) Factors

{¶ 26} The relevant R.C. 2151.414(B)(1)(a)-(e) factors include (a) the child cannot be placed with either parent within a reasonable period of time or should not be placed with either parent; (b) the child is abandoned; and (d) the child has been in the temporary custody of one or more public or private children services agencies

for 12 or more months of a consecutive 22-month period. "Only one of the factors must be present to satisfy the first prong of the two-part analysis for granting permanent custody to an agency." *In re D.H.*, 8th Dist. Cuyahoga No. 110505, 2021-Ohio-3821, ¶ 27, citing *In re L.W.*, 8th Dist. Cuyahoga No. 104881, 2017-Ohio-657.

{¶ 27} Here, the juvenile court found pursuant to R.C. 2151.414(B)(1)(d) that the children were in the temporary custody of CCDCFS for 12 or more months of a consecutive 22-month period that commenced in June 2019. This period is calculated from the time a child enters the agency's temporary custody to the time the agency files a motion for permanent custody. *Id.*, citing *In re J.C.*, 8th Dist. Cuyahoga No. 106272, 2018-Ohio-2234, ¶ 29. The children remained in the agency's temporary custody from June 2019, until the agency filed its motion for permanent custody nearly two years later in May 2021. Within this 22-month period, the children were in Mother's custody subject to the agency's protective supervision for only one month, from October to November 2020, after which they were once more removed and placed in the agency's temporary custody. The record therefore clearly and convincingly supports the juvenile court's finding that the children were in the agency's custody for 12 or more months of a consecutive 22-month period. When R.C. 2151.414(B)(1)(d) applies, as it does here, the juvenile court is not required to make any other finding and may proceed to the best interest determination. *In re L.W.*, 8th Dist. Cuyahoga No. 107708, 2019-Ohio-1343, ¶ 26; *In re T.H.*, 8th Dist. Cuyahoga No. 100852, 2014-Ohio-2985, ¶ 18.

{¶ 28} The juvenile court nevertheless made additional findings. The juvenile court found that the children could not be placed with Mother or their respective fathers or alleged fathers within a reasonable time or should not be placed with them as set forth in R.C. 2151.414(B)(1)(a). In cases where R.C. 2151.414(B)(1)(a) applies, courts look to the factors set forth in R.C. 2151.414(E) to determine whether a child cannot be placed with a parent within a reasonable time or should not be placed with a parent. *In re L.J.*, 8th Dist. Cuyahoga No. 111221, 2022-Ohio-2278, ¶ 43. These factors include, among others, whether the parent failed continuously and repeatedly to substantially remedy the conditions that had caused the removal of the child, including parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parent (R.C. 2151.414(E)(1)); whether chronic mental illness, intellectual disability, physical disability, or chemical dependency of the parent is so severe that it makes the parent unable to provide an adequate permanent home for the child (R.C. 2151.414(E)(2)); whether the parent has neglected the child between the filing of the complaint alleging neglect and the filing of the motion for permanent custody (R.C. 2151.414(E)(3)); whether the parent has demonstrated a lack of commitment toward the child by actions showing an unwillingness to provide an adequate permanent home for the child (R.C. 2151.414(E)(4)); whether the parent has abandoned the child (R.C. 2151.414(E)(10)); whether the parent has had parental rights involuntarily terminated with respect to a sibling of the child (R.C. 2151.414(E)(11)); whether the

parent is incarcerated at the time of the filing of the motion for permanent custody and will not be available to care for the child for at least 18 months after the motion was filed (R.C. 2151.414(E)(12)); whether the parent is repeatedly incarcerated and the repeated incarceration prevents the parent from providing care for the child (R.C. 2151.414(E)(13)); and whether for any reason the parent is unwilling to provide food, clothing, shelter, and other basic necessities for the child or prevent the child from suffering emotional and mental neglect (R.C. 2151.414(E)(14)). The statute also permits the court to consider "any other factor the court considers relevant." R.C. 2151.414(E)(16).

{¶ 29} Only one of the enumerated factors under R.C. 2151.414(E) is required to exist for the court to make the finding that "'the child cannot be placed with either parent within a reasonable time or should not be placed with either parent.'" *In re L.W.*, 8th Dist. Cuyahoga No. 107708, 2019-Ohio-1343, ¶ 29, quoting *In re Glenn*, 139 Ohio App.3d 105, 113, 742 N.E.2d 1210 (8th Dist.2000), and citing *In re R.M.*, 8th Dist. Cuyahoga Nos. 98065 and 98066, 2012-Ohio-4290, ¶ 14 (the existence of only one factor will support the court's finding that the child cannot be reunified with the parent within a reasonable time).

{¶ 30} Here, the juvenile court based its R.C. 2151.414(B)(1)(a) finding on the factors set forth in 2151.414(E)(1), (2), (4), (11), and (14) with respect to Mother and the factors set forth in 2151.414(E)(3), (4), (10), (12), (13), and (14) with respect to each child's father or alleged father. The court found that

[f]ollowing the placement of the child[ren] outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents [or mother and alleged father] to remedy problems that initially caused the child[ren] to be placed outside the home, the parents [or mother and alleged father] have failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child[ren]'s home.

Mother has a chronic mental illness and chemical dependency that is so severe that it makes the parent unable to provide an adequate, permanent home for the child[ren] at the present time and, as anticipated, within one (1) year after the Court holds the hearing in this matter.

Mother has demonstrated a lack of commitment towards the child[ren] by her unwillingness to provide an adequate and safe permanent home for the child[ren]. Testimony revealed that mother allows family members into her home that are suspected to be gang involved. Evidence further revealed that in August 2020, an individual was shot and killed in her home and then in October 2020, her child, [K.H.], born December 11, 2016, was shot while in her home and while mother left her children under the supervision of other family members.

Mother has had parental rights terminated involuntarily with respect to a sibling of the child[ren].

Mother is unwilling to provide a safe and secure shelter or to prevent the child[ren] from suffering emotional or mental neglect, as evidenced by her unwillingness to successfully complete a case plan so she can provide care for the child[ren].

Father[s or alleged fathers] ha[ve] neglected the child[ren] between the date the original complaint was filed and the filing of this Motion [for Permanent Custody] by the failure to visit, communicate, or support the child[ren].

Father[s or alleged fathers] ha[ve] demonstrated a lack of commitment to toward the child[ren] by failing to regularly support, visit, or communicate with the child[ren] when able to do so, or by [their] other actions, ha[ve] shown an unwillingness to provide an adequate, permanent home for the child[ren].

Father[s or alleged fathers] ha[ve] abandoned the child[ren].

Alleged father [of K.H.] is incarcerated at the time of the filing of this Motion [for Permanent Custody] and will not be available to care for the child for at least eighteen (18) months after the filling of the Motion for Permanent Custody.

Father [of A.H., father of Q.H., and alleged father of K.H. are] repeatedly incarcerated and the repeated incarceration prevents the parent[s and alleged father] from providing care for the child[ren].

Father[s or alleged fathers are] unwilling to provide food, clothing, shelter, or other necessities for the child[ren], or to prevent the child[ren] from suffering emotional or mental neglect, as evidenced by [their] unwillingness to successfully complete a case plan so [they] can provide care for the child[ren].

### 1. R.C. 2151.414(E)(1)

{¶ 31} Pursuant to R.C. 2151.414(E)(1), the juvenile court found that Mother failed continuously and repeatedly to substantially remedy the conditions that had caused the removal of the children. The record reveals that the children were initially removed because Mother did not have stable housing and failed to ensure that D.H., A.H., and Q.H. regularly attended school. K.H. was not school age at the time CCDCFS filed its complaint. Mother's case plan provided for mental-health and substance-abuse assessment and periodic drug screens; the children's regular attendance at school and completion of assignments; counseling for D.H. following behavioral concerns and multiple school suspensions; and provision for housing and basic needs.

{¶ 32} Mother argues that she substantially completed these case plan objectives. Substantial compliance with a case plan, however, is not solely dispositive. *In re P.B.*, 8th Dist. Cuyahoga Nos. 109518 and 109519, 2020-Ohio-4471, ¶ 92. Under R.C. 2151.414(E)(1), the issue is not whether Mother substantially

complied with the case plan, but whether Mother remedied the conditions that caused the children's removal. *Id.*, citing *In re J.B.*, 8th Dist. Cuyahoga No. 98546, 2013-Ohio-1704, ¶ 90.

{¶ 33} CCDCFS acknowledged that Mother met several case plan objectives. The caseworker testified that Mother did obtain housing and completed mental-health and substance-abuse assessments. The caseworker also testified that while Mother testified positive for marijuana and amphetamines in March 2019, her later drug screens came back negative, and this objective was subsequently removed from the case plan by court order. However, the caseworker also testified that Mother minimally complied with the substance-abuse objectives. The caseworker testified that Mother had not completed the intensive outpatient treatment to which she had been referred by a substance-abuse counselor. The caseworker also testified that even after drug testing was removed from the case plan, the agency had lingering concerns about Mother's substance abuse because she did not complete the drug screens within 24 hours, which the agency deems an automatic positive. Further, the caseworker testified that she observed a bong on Mother's counter, which Mother denied was hers. The caseworker added that Mother lives alone and refused drug testing. In addition, the caseworker and Dr. Waltman testified that while Mother attended mental-health assessments, she did so belatedly and did not appear amenable to any treatment.

{¶ 34} The caseworker's testimony also revealed that Mother did not meet other case plan objectives. The caseworker testified that despite repeated

reminders, Mother would return the children from weekend visits without having completed their homework. The GAL testified that she did not believe Mother was invested in the children's education. The caseworker testified that Mother did not continue the children's counseling, did not ensure D.H. had his prescription medication, and did not follow through with the children's dental appointments.

## 2. R.C. 2151.414(E)(2)

{¶ 35} Under R.C. 2151.414(E)(2), the juvenile court found that Mother suffers from "chronic mental illness and chemical dependency" that makes her unable to provide the children with an adequate permanent home. In addition to the caseworker's testimony that the agency had lingering concerns about Mother's substance abuse, the caseworker also testified that in February 2021, following the children's second removal from Mother's home, the caseworker received a voicemail at 4:30 a.m., indicating that Mother was at a party. When the caseworker asked Mother about the call, Mother replied that she is an adult, alcohol is not illegal, and she can party whenever she wants. Also admitted into evidence was an unresolved citation for OVI from 2016 and a warrant issued for Mother's arrest after she failed to appear, which Mother admitted in her interview with Dr. Waltman.

{¶ 36} Concerning Mother's mental health, the record contains a journal entry from the 2005 case terminating Mother's custody of the children's siblings, in which the court stated that "Mother has a severe dependent personality disorder and may have issues with depression" but "does not believe she has any mental health issues and has not shown any initiative in seeking treatment." Following his

evaluation of Mother in 2021, Dr. Waltman reached similar conclusions about Mother's amenability to treatment. Mother was initially referred in November 2020, but met with Dr. Waltman more than a year later in December 2021, after the first referral's lapse required a second referral. Dr. Waltman testified that psychological testing did not confirm a diagnosable disorder but added that Mother's defensive posture during testing could have presented a false negative. Dr. Waltman also testified that Mother uses denial and minimization to avoid accepting responsibility for problems associated with her parenting, noting that because of this mentality, Mother is "not likely to exercise good judgment regarding her children's care or needs" and "very likely not to recognize problems and dangers her children face and consequently will not act on them in an appropriate manner."

{¶ 37} Dr. Waltman offered, for example, Mother's response to the agency's removal of the children following the shooting of K.H. Dr. Waltman testified that Mother stated she did not know why the children were removed. In his evaluation report, Dr. Waltman observed that

> [Mother] said CFS took custody of her children again in November after "my baby got shot in the foot." She admitted she was not present when the incident occurred and did not know the details of how the incident occurred. This impressed the examiner because most parents would react with alarm and want a detailed explanation of how such a thing could occur. [Mother] lacked insight into why CFS took custody of her children following that incident saying, "that's what I'm trying to figure out too." She recalled vaguely [that] CFS told her they took custody because of the shooting. Observing this incident occurred over 13 months before the examiner asked how it was her children were still in custody. She responded flippantly "because I had to do this," referring to the current evaluation. It is her belief CFS had no concerns

about abuse or neglect. She believes the removal of her children was unwarranted.

Dr. Waltman concluded that Mother's failure to accept responsibility, coupled with her history of noncompliance, precluded a recommendation because Mother was not amenable to services.

{¶ 38} A review of the record reveals that Mother has suffered from substance-abuse and mental-health disorders in the past and failed to fully cooperate with the agency's referrals for drug testing, substance-abuse counseling and treatment, and mental-health assessment.

### 3. R.C. 2151.414(E)(4)

{¶ 39} Under R.C. 2151.414(E)(4), the juvenile court found that Mother demonstrated a lack of commitment to the children by her unwillingness to provide a safe and adequate permanent home for them. As noted above, testimony revealed that following the children's reunification with Mother in October 2020, K.H., Mother's youngest child, was shot in Mother's home. The caseworker testified that a police investigation concluded that the gun was fired inside the home; the gun belonged to Mother's nephew, M.B., whom the police suspected was responsible for the shooting; and M.B. had gang affiliation and a warrant out for his arrest for violent crimes. The agency subsequently discovered that a few months before K.H. was shot, another child had been shot and killed in Mother's home. The caseworker testified that when she shared her concerns about the children's safety with Mother, Mother minimized these concerns and said that M.B. would continue to be welcome in her home.

### 4. R.C. 2151.414(E)(11)

{¶ 40} The juvenile court found under R.C. 2151.414(E)(11) that Mother had her parental rights involuntarily terminated with respect to a sibling of the children. In 2005, the agency was granted permanent custody of two of the children's now-adult siblings. The journal entry granting permanent custody was admitted into evidence and states that Mother "does not support her children." In the instant case, the agency initially removed the children because Mother was neglecting their basic needs. Although the 2005 case is dated, it does show that Mother had not remedied concerns about her ability to "provide a legally secure placement and adequate care for the health, welfare, and safety of [her] child[ren]."

### 5. R.C. 2151.414(E)(10), (12)-(14)

{¶ 41} Pursuant to R.C. 2151.414(E)(10), (12)-(14), the juvenile court found that the children's respective fathers or alleged fathers have abandoned, neglected, or demonstrated a lack of commitment to the children by failing to support or visit them. The record shows that the children have little or no interaction with their fathers. D.H. was initially placed with his alleged father, J.M., but J.M. could not manage D.H.'s behavior, and D.H. was subsequently removed. The caseworker testified that when D.H. was removed, J.M. expressed his wish that D.H. be placed with a nice family and thereafter stopped communicating with him. The remaining children's fathers or alleged fathers are incarcerated and, with the exception of A.H.'s father, M.T., who communicates with A.H. on a "semiregular basis," the other fathers have had no contact with their children.

{¶ 42} The juvenile court also found pursuant to R.C. 2151.414(E)(14) that Mother is unwilling to provide a safe and secure home for the children or prevent them from suffering emotional or mental neglect. In addition to testimony that Mother minimized the agency's concerns about the children's safety following the shooting of K.H. in her home, the caseworker also testified that Mother did not make sure the children continued attending counseling or that D.H. continued taking medication that he had been prescribed to help him manage his aggression following diagnoses for oppositional defiant disorder and PTSD.

{¶ 43} We acknowledge that Mother has made progress toward meeting some of the objectives of her case plan. The record reveals that Mother participated in substance-abuse assessment, tested negative for drugs, and obtained housing. As this court has previously stated, however, even substantial compliance, "[a]though commendable," "does not of itself preclude a grant of permanent custody to a children services agency" and "does not mean that the parent has achieved the ultimate goals of the plan or that the parent has substantially remedied the conditions that caused the children to be removed." *In re A.P.*, 8th Dist. Cuyahoga No. 104129, 2016-Ohio-5848, ¶ 19, citing *In re J.B.*, 8th Dist. Cuyahoga Nos. 98566 and 98567, 2013-Ohio-1706. The record also reveals that despite Mother's progress toward meeting these case plan objectives, there were some lingering concerns about Mother's substance abuse and mental health and serious concerns about the children's safety while in Mother's home. Mother also failed to remedy, and testimony revealed that Mother took little interest in remedying, other case plan

objectives, such as ensuring that the children complete school assignments, that D.H. take his medication and continue counseling services to help him manage his behavior, and that the children's basic medical and dental care needs are being met.

{¶ 44} Taken together, this evidence supports the juvenile court's finding that despite the agency's efforts to reunify the children with Mother, Mother was not amenable to services and failed to remedy the conditions that caused the children to be placed outside the home. Standing alone, this evidence is sufficient to satisfy the first prong of the two-part analysis. Nevertheless, the juvenile court also found that Mother demonstrated a lack of commitment to the children, was unable to provide the children with a safe permanent home, and had her parental rights involuntarily terminated with respect to the children's siblings for reasons similar to those in the instant case. Accordingly, we find the record clearly and convincingly supports the juvenile court's determination under R.C. 2151.414(B)(1)(a) that the children could or should not be placed with Mother within a reasonable time.

{¶ 45} Having found that the juvenile court properly determined that at least one of the R.C. 2151.414(B)(1) factors applies by clear and convincing evidence, we must next determine whether the juvenile court appropriately found by clear and convincing evidence that granting permanent custody to the agency is in the children's best interest under R.C. 2151.414(D).

## B. R.C. 2151.414(D)(1) Best Interest Determination

{¶ 46} The R.C. 2151.414(D)(1)(a)-(e) factors include (a) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster

caregivers, and out-of-home providers; (b) the child's wishes, as expressed directly by the child or through the child's guardian ad litem; (c) the child's custodial history; (d) the child's need for a legally secured permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (e) whether any of the factors set forth in R.C. 2151.414(E)(7)-(11) apply. A juvenile court must consider each of the R.C. 2151.414(D)(1) factors when making a permanent custody determination, but no one factor is given greater weight than the others. *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56. Further, only one of the factors set forth in R.C. 2151.414(D)(1) needs to be resolved in favor of permanent custody. *In re G.W.*, 2019-Ohio-1533, at ¶ 72.

{¶ 47} Here, the juvenile court found "by clear and convincing evidence that a grant of permanent custody is in the best interest of the child[ren]." This court recognizes that "[a] child's best interests require permanency and a safe and secure environment." *In re D.H.*, 2021-Ohio-3821, at ¶ 36, quoting *In re K.M.*, 8th Dist. Cuyahoga No. 95374, 2011-Ohio-349, ¶ 23. As noted above, the children could not be placed with Mother because she could not provide a safe and secure home and continued to neglect the children's basic needs after their brief reunification in October 2020. The children could not be placed with their fathers or alleged fathers because their respective fathers or alleged fathers discontinued care and contact either expressly, as is the case with D.H.'s father, or due in part to their incarceration, as is the case with the fathers or alleged fathers of A.H., Q.H., and K.H. The agency found no connection between the children and their paternal

relatives and no other relatives who were willing or able to provide a permanent home for the children. The caseworker's testimony also revealed that the children's foster caregivers were meeting their needs and Q.H. had formed a strong connection with an intervention specialist at his school.

{¶ 48} At the court's request, the children's GAL put her recommendation on the record. Although the GAL testified that the children wished to return to Mother, the GAL believed permanent custody was in the children's best interest because Mother failed to appreciate the danger in which she placed the children, was not invested in the children's education, and allowed the children's medical and dental issues to go untreated. The GAL's impressions were consistent with Dr. Waltman's testimony that Mother is unlikely to recognize the dangers that her children face and act appropriately as well as the caseworker's testimony that Mother was not meeting the children's basic needs prior to each removal.

{¶ 49} The children's custodial history showed that they were in the agency's temporary custody for over a year when their brief return to Mother was cut short by the shooting of K.H. in Mother's home, after which Mother became more resistant to the agency's assistance and the agency had to create a concurrent plan of permanent custody. Further, as noted above, the record supports the juvenile court's finding under R.C. 2151.414(E)(11) that Mother had her parental rights involuntarily terminated with respect to the children's siblings and its finding under 2151.414(E)(10) that the children's fathers or alleged fathers abandoned them.

{¶ 50} A review of the record therefore reveals clear and convincing evidence supporting the juvenile court's finding that permanent custody to the agency was in the children's best interest and that the juvenile court did not abuse its discretion in awarding permanent custody of the children to CCDCFS.

{¶ 51} Accordingly, Mother's first and second assignments of error are overruled.

## C. Ineffective Assistance of Counsel

{¶ 52} In her third assignment of error, Mother contends that her trial counsel was ineffective for failing to object to the admission of certain exhibits and hearsay testimony, not moving to strike Dr. Waltman's testimony and report after Dr. Waltman questioned the validity of his findings, and eliciting testimony from the GAL that was contrary to Mother's interest. The agency maintains that the challenged exhibits were self-authenticating, the juvenile court was capable of disregarding any hearsay in reaching its determination, Mother missed the point of Dr. Waltman's testimony concerning the validity of his findings, and the GAL's duty was to make a recommendation to the court.

{¶ 53} "[A]n indigent parent is entitled to effective assistance of appointed counsel when the state seeks to terminate her parental rights." *In re L.C.*, 8th Dist. Cuyahoga No. 111053, 2022-Ohio-1592, ¶ 55, citing *In re A.C.*, 8th Dist. Cuyahoga No. 99057, 2013-Ohio-1802, ¶ 45. "'[T]he test for ineffective assistance of counsel used in criminal cases is equally applicable in actions seeking to force the permanent, involuntary termination of parental' rights." *In re A.C.* at ¶ 45, quoting

*In re P.M.*, 179 Ohio App.3d 413, 2008-Ohio-6041, 902 N.E.2d 74, ¶ 15 (2d Dist.). To prevail on an ineffective-assistance-of-counsel claim, Mother must prove that (1) counsel's performance was deficient and (2) that deficiency prejudiced her defense. *State v. Davis*, 159 Ohio St.3d 31, 2020-Ohio-309, 146 N.E.3d 560, ¶ 10, citing *State v. Bradley*, 42 Ohio St.3d 136, 141-142, 538 N.E.2d 373 (1989), and *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Mother must demonstrate that her counsel's performance fell below an objective standard of reasonableness and there is a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. *Id.*, citing *Bradley* at paragraphs two and three of the syllabus. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Bradley* at 142, quoting *Strickland* at 694. The failure to prove either prong of this two-part test makes it unnecessary for a court to consider the other prong. *State v. Madrigal*, 87 Ohio St.3d 378, 389, 721 N.E.2d 52 (2000), citing *Strickland a*t 697.

{¶ 54} Mother first argues that her counsel failed to object the admission of juvenile court docket entries from the initial filing of this matter (Case Nos. AD18915778-81) and the citation and docket entries associated with Mother's 2016 OVI. The agency argues that these documents are self-authenticating. Evid.R. 902(4) provides that extrinsic evidence of authenticity is not required as a condition precedent to admissibility for certified copies of public records, and Evid.R. 803(8) excludes public records and reports from the hearsay rule. *In re L.J.*, 8th Dist. Cuyahoga No. 111221, 2022-Ohio-2278, ¶ 33, citing *In re I.T.*, 9th Dist. Summit Nos.

27513, 27560, 27581, 2016-Ohio-555 ("certified court documents are self-authenticating under Evid.R. 902(4) and are admissible under the public records exception to the hearsay rule"). The same rule applies to the municipal docket entry associated with Mother's 2016 OVI. *Cleveland v. Boone*, 8th Dist. Cuyahoga No. 105762, 2018-Ohio-849, ¶ 29, quoting *State v. Davis*, 9th Dist. Summit No. 25680, 2012-Ohio-788, ¶ 17 ("certified municipal court documents that are self-authenticating under Evidence Rule 902(4) are admissible under the public records exception to the hearsay rule"). The agency's exhibits are therefore admissible, and to the extent that Mother contests whether she is the same K.H. who was cited for OVI and failed to appear, Mother admitted as much in her interview with Dr. Waltman. *See State v. Rucker*, 2018-Ohio-1832, 113 N.E.3d 81, ¶ 30 (8th Dist.) (admissions of a party opponent are admissible non-hearsay under Evid.R. 801(D)(2)). Therefore, Mother has not shown that her counsel was deficient in falling to object to the public documents admitted at trial.

{¶ 55} Mother next argues that her counsel failed to object to hearsay testimony from Dr. Waltman concerning findings in his report. The agency argues that Dr. Waltman authored the report and testified to its contents. When an expert testifies to the contents of his report, the report is not hearsay. *Teamster Hous. v. McCormack*, 8th Dist. Cuyahoga No. 69583, 1996 Ohio App. LEXIS 1880, 13 (May 9, 1996), citing *Worthington City Schools v. ABCO Insulation*, 84 Ohio App.3d 144, 151, 616 N.E.2d 550 (10th Dist.1992). Also, when the trial court is the trier of fact, we presume that the judge disregards improper hearsay evidence unless it is shown

that the trial court actually relied on that evidence in its judgment. *In re M.A.L.-C.*, 8th Dist. Cuyahoga No. 111041, 2022-Ohio-1845, ¶ 27, citing *In re M.H.*, 8th Dist. Cuyahoga No. 80620, 2002-Ohio-2968, ¶ 73. To the extent that anything in Dr. Waltman's report constitutes hearsay, Mother does not provide any evidence that the juvenile court's custody determination was based entirely upon it. Therefore, even if Mother can demonstrate that her counsel was deficient in failing to object to any hearsay evidence included in Dr. Waltman's report, she has not shown that the deficiency prejudiced her defense.

{¶ 56} Mother also argues that her counsel failed to object to the caseworker's hearsay testimony concerning the results of the police investigation following the shooting of K.H. in Mother's home. Specifically, Mother challenges the caseworker's statements that the police investigation had concluded that the gunshot came from inside the home; Mother's nephew, M.B., was believed to be the shooter; and M.B. was gang affiliated. The agency argues that the reasons for the children's November 2020 removal were already litigated at a prior hearing and the caseworker's testimony concerned barriers to the agency's reuniting the children with Mother. We find the agency's argument more persuasive. Statements are not hearsay if they are not offered to prove the truth of the matter asserted. *In re D.W.*, 8th Dist. Cuyahoga No. 107920, 2019-Ohio-3104, ¶ 48.

{¶ 57} Here, the caseworker testified that this was the second shooting in Mother's home and that the first occurred in August 2020, during which a child was killed inside Mother's home. The agency only learned of the August 2020 shooting

death following the shooting of K.H. in November 2020. The caseworker testified that when she discussed these shootings with Mother, Mother minimized their seriousness. The caseworker testified that she had informed Mother about the agency's concerns that M.B. might be gang affiliated, and Mother had replied that M.B. is family and family is always welcome in her home any time. The caseworker offered this testimony in answer to questions asking why the children could not be reunited with Mother and why permanent custody to the agency was in the children's best interest.

{¶ 58} The record also reveals that the juvenile court largely disregarded any hearsay in the caseworker's testimony. On cross-examination, counsel for Mother asked the caseworker how she could conclude that the gun was fired inside the home if she was not at the scene. The juvenile court sustained the agency's objection that the reasons for the children's November 2020 removal was litigated at a prior hearing. The juvenile court's subsequent finding that Mother demonstrated a lack of commitment to providing an adequate and safe permanent home for the children was based on Mother's response to the shootings, not the facts and circumstances of the shootings themselves:

> Mother has demonstrated a lack of commitment towards the child[ren] by her unwillingness to provide an adequate and safe permanent home for the child[ren]. Testimony revealed that mother allows family members into her home that are suspected to be gang involved. Evidence further revealed that in August 2020, an individual was shot and killed in her home and then in October 2020, her child, [K.H.], born on December 11, 2016, was shot while in her home and while mother left her children under the supervision of other family members.

Because Mother has not demonstrated that the caseworker's testimony is hearsay, she has not shown that her counsel's performance was deficient. *See In re D.W.* at ¶ 53. Further, even if the caseworker's testimony concerning the circumstances surrounding the shooting of K.H. were hearsay, Mother has not demonstrated that the juvenile court's permanent-custody determination was based solely on those circumstances and therefore has not established that admission of this testimony undermines confidence in the outcome. *See In re M.A.L.-C.* at ¶ 27-28.

{¶ 59} Mother further argues that her counsel failed to move to strike Dr. Waltman's testimony and report after Dr. Waltman testified that his findings may be invalid. The agency argues that Mother mischaracterizes Dr. Waltman's testimony. We agree with the agency. Dr. Waltman testified that he could not confirm the presence of a diagnosable mental-health or substance-abuse disorder but noted that Mother's defensive posture during his evaluation could have presented a "false negative." Dr. Waltman also testified that Mother's minimization and failure to appreciate her role in providing a safe home for the children did not make her amenable to treatment. Dr. Waltman's inability to confirm a diagnosis did not make his testimony or report irrelevant to the question whether Mother could provide a legally safe and secure home for the children.

{¶ 60} Finally, Mother argues that her counsel failed to object to and elicited damaging testimony from the caseworker and the children's GAL. Mother maintains that her counsel should have objected when the caseworker, who is not a counselor, was asked whether Dr. Waltman's evaluation resolved the agency's

concerns about Mother's mental health. The caseworker responded that Dr. Waltman's evaluation did not position the agency to make a referral because the evaluation concluded that Mother was not amenable to counseling. The caseworker was not offering an expert opinion concerning Mother's mental health, merely explaining the agency's response to Dr. Waltman's evaluation. Mother also maintains that her counsel prompted harmful testimony from the caseworker by asking what she had observed about the effect Mother's alleged drug use had on the children. In answer to this question, the caseworker offered her observations as a "non-counselor" and therefore qualified her response. This question also followed a sustained objection to counsel's asking whether the caseworker agreed with the conclusions Dr. Waltman reached in his evaluation. The basis of the objection was that the caseworker was not a counselor. The record therefore demonstrates that the juvenile court was capable of disregarding inadmissible evidence.

{¶ 61} Mother further maintains that her counsel elicited damaging testimony from the children's GAL by asking whether the GAL believed permanent custody would be in the children's best interest if it occasioned the children's separation from one another. However, it is the GAL's duty to make a best-interest recommendation to the juvenile court, and the record reveals that juvenile court itself requested that the GAL put her recommendation on the record. Therefore, Mother has not demonstrated that any of these lines of questioning prejudiced her defense.

{¶ 62} Accordingly, Mother's third assignment of error is overruled.

{¶ 63} Judgment is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, JUDGE

ANITA LASTER MAYS, P.J., and
FRANK DANIEL CELEBREZZE, III, J., CONCUR