[Cite as *In re N.C.*, 2025-Ohio-2011.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| IN RE N.C., ET AL. | : | |
| | | No. 114646 |
| A Minor Child | : | |
| | | |
| [Appeal by A.C., Mother] | : | |

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** June 5, 2025

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD23901915

### *Appearances:*

Rosel C. Hurley, III, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney and Joseph C. Young, Assistant Prosecuting Attorney, *for appellee,* Cuyahoga County Division of Children and Family Services.

MARY J. BOYLE, J.:

{¶ 1} In this companion appeal, appellant A.C. ("Mother") appeals the decision of the Cuyahoga County Juvenile Court terminating her parental rights and awarding permanent custody of her minor child, N.C., to the Cuyahoga County

Division of Children and Family Services ("CCDCFS" or "agency").[1]  Mother raises the following two assignment of error for review:

> **Assignment of Error I:**  The trial court committed reversible error when it granted permanent custody to [CCDCFS] as the trial court's decision was not supported by clear and convincing evidence and was against the manifest weight of the evidence under the provision of R.C. 2151.414.

> **Assignment of Error II:**  The trial court committed reversible error when it granted permanent custody to [CCDCFS] as the trial court's decision was not in the best interest of the child.

{¶ 2}  For the reasons set forth, we affirm the juvenile court's judgment.

## I.  Facts and Procedural History

{¶ 3}  This matter began in November 2022, when N.C. was committed to the predispositional temporary custody of CCDCFS.  This complaint could not be resolved within the statutory time frame, and the matter was refiled in February 2023.  In this complaint, CCDCFS alleges that N.C. was dependent and requested a dispositional order of temporary custody.  The complaint alleges that N.C. has been in the uninterrupted custody of CCDCFS since November 9, 2022 (N.C. was eight days old at that time), Mother has mental-health issues and she failed to consistently engage in services, and Mother lacks stable housing and the judgment and decision-making skills needed to provide safe and appropriate care for N.C.  The complaint additionally alleges that Mother had pending criminal charges for aggravated arson and assault and Mother and D.T. ("Father") have a

---

[1] This appeal is a companion to Father's appeal in *In re N.C.*, 8th Dist. Cuyahoga No. 114690.  We only address Mother's appeal herein.

domestically violent relationship in which Father has a pending criminal case for domestic violence involving Mother as the victim with a no-contact order between the two of them as a condition of Father's bond.[2] With regard to Father, the complaint alleges that Father has a substance-abuse issue (specifically cocaine and alcohol), which affected his ability to provide appropriate care for N.C. Father was engaged in services at the time the complaint was filed, but CCDCFS alleges that while Father was engaged in services, he needed to demonstrate and maintain his sobriety.

{¶ 4} The court held a hearing in February 2023, and N.C. was again committed to the predispositional temporary custody of CCDCFS. At the adjudicatory hearing in April 2023, Mother admitted to the allegations of the complaint as amended, after which the court adjudicated N.C. dependent. Following the dispositional hearing in May 2023, the court ordered N.C. to be placed in the temporary custody of CCDCFS. In doing so, the court found that "Mother is currently incarcerated. Mother needs to complete parenting education and nurturing parenting services. Mother needs to engage in mental health services and establish housing. Father needs to comply with mental health services and substance abuse treatment. Father has recently relapsed." (Judgment entry, May 31, 2024.)

---

[2] Father's paternity was later established.

{¶ 5} Thereafter, CCDCFS moved to modify temporary custody to permanent custody and Mother filed a motion for legal custody. The court proceeded to trial on these motions in November 2024. The following evidence was adduced at trial.

{¶ 6} CCDCFS worker Octavia Manuel ("Manuel") testified that she was assigned to N.C.'s case from November 2022 to June 2024. According to Manuel, the case was first brought to the agency's attention on October 28, 2022, when Mother was arrested for vandalizing her sister's car. Mother went into labor while she was in jail and was transported to MetroHealth Hospital where N.C. was born on November 1, 2022. Following his birth, Mother and Father were asked to leave the NICU due to their aggressive behavior. Manuel learned that that there was a domestic-violence incident involving Mother and Father and a no contact order was in place. Subsequently, the agency took emergency custody of N.C. on November 9, 2022.[3] N.C. was adjudicated dependent and was placed in the temporary custody of CCDCFS and has remained in agency custody through the time of trial in November 2024.

{¶ 7} Mother's case plan included services to address her issues with parenting, mental health, and her pending legal matters, and the permanency plan was reunification. Manuel testified that Mother was referred to the Heights Community Collaborative for parenting services and she was linked with Catholic

---

[3] Following N.C.'s removal, CCDCFS tried to identify an appropriate relative as caregiver but was unsuccessful. As a result, N.C. was initially placed in foster care, but was later moved to the care of his maternal grandfather ("Grandfather") in May 2024.

Charities for her mental-health services. Mother completed her parenting services but was discharged from her mental-health services through Catholic Charities in February 2023, after which she was referred to Brighter Tomorrow in April 2023. Since then, Mother has been compliant with her case-plan services. Mother had weekly visits with N.C. Initially, Mother was inconsistent in attending these visits, but following her hospitalization in July 2023, she consistently attended the scheduled visits. While these visits went well, Manuel had some concerns about Mother's lack of bonding with the child during their visits at the library and her use of age-inappropriate direction for the then one-year-old child. Manuel further testified that Mother's home is appropriate and Mother has the means to provide for N.C.'s basic needs. While Mother completed her case-plan services, Manuel testified that she did not see that Mother benefitted from those services.

{¶ 8} Manuel further testified that Mother could not make good decisions for N.C. with Father around and the nature of the domestically violent relationship between Mother and Father was a concern throughout the pendency of the proceedings. Mother advised Manuel at the time of the initial dispositional hearing that she did not plan to appear in court for Father's domestic violence charge, which was later dismissed because Mother failed to appear. Manuel described an incident in March 2024, where she had an unannounced visit at Mother's home. Previous to that visit, Manuel advised Mother that she would visit the home, unannounced, to confirm Mother's claim as made in court that she and Father were no longer together. When Manuel entered the home, Mother denied that Father was present.

However, Manuel found Father hiding in a bedroom closet. Father then "popped out of the closet and he started being really aggressive, calling [Manuel] out of [her] name, telling [her] to get the F out using expletives, and [they] had a whole little argument. His face was beet red. He was hollering and [she] had finally experienced what [she] had previously been told [herself]." (Tr. 25.)

{¶ 9} With regard to Father's case plan, the agency offered substance abuse, domestic violence, and basic-needs services. Manuel testified that anger management was added to the case-plan services following an incident where Father became aggressive with the caseworker at a visit with N.C. to the point where the caseworker had to end the visit. Father was initially linked with NORA to address his admitted abuse of alcohol and cocaine, and after his discharge from the NORA program, he sought out treatment at People, Places, and Dreams. Father failed to complete either of these programs. Father was inconsistent with completing his drug screens. When he did complete them, the results came back negative. In May 2024, CCDCFS asked him to submit to a drug screen. He refused to provide a sample, but Manuel learned that Father tested positive for cocaine through the treatment program he attended at that time. Father was also referred to the Heights Community Collaborative for housing assistance, but that service ended when he was dismissed from that program. Manuel further testified that Father did not complete his referral for anger-management services.

{¶ 10} CCDCFS worker Sierra Whatley ("Whatley") took over N.C.'s case from Manuel in June 2024 and continued to work on the case through the time of

trial. Whatley testified that Mother has been compliant with her case-plan services. N.C. was placed with maternal grandfather ("Grandfather") just prior to her receiving the case. At that time, Mother's visits with N.C. were weekly and took place at Grandfather's home and were supervised by Grandfather. According to Whatley, Mother attended those visits. Grandfather told Mother she can visit "anytime she wants" and, in the summertime, "offered her to come along so that she could spend . . . more time with [N.C.]" (Tr. 43.) Mother declined the vacation offer.

{¶ 11} At some point in time, around the end of August 2024 or September 2024, Mother reached out to Whatley requesting that Whatley supervise the visits because of "the back-and-forth between [Mother] and [Grandfather.]" (Tr. 43.) As a result, Whatley began to schedule the visits, which, at the time of trial, took place at the library, every other week. Whatley testified that Mother was "in agreement" with the "bi-weekly visits[.]" (Tr. 44.) Whatley testified that during the most recent visit prior to trial, Mother was frustrated by N.C.'s behaviors and "kinda sat down at the table for maybe 20 to 25 minutes not really engaging with him," leaving Whatley to redirect N.C. from "trying to hit" another child. (Tr. 46.) N.C. "was busy and running up to other kids, and when [Mother] would try to redirect him, he would have a temper tantrum." (Tr. 45.) These observations led Whatley to the concern that Mother did not fully benefit from her parenting program or the supportive-visitation coach such that she could demonstrate the ability to appropriately address N.C.'s behaviors.

**{¶ 12}** With regard to Mother's housing, Whatley testified that Mother had housing. Whatley explained that while Mother's apartment was appropriate, the building it was in "looks very condemned. There's several boarded up windows. . . . Walking through it was multiple vacant apartments with doors open. The stairs, it was like glass, dirt. It looked condemned until you got into her apartment." (Tr. 55.) As a result, Whatley felt that the building posed a safety risk.

**{¶ 13}** In August 2024, Father met with Whatley, at which time he claimed "he had completed anger management services at Beech Brook and was involved in substance abuse treatment through Stella Maris" and that he planned to seek mental health and medical services from the Cleveland Clinic. (Tr. 48.) Whatley verified that he began services in July 2024, he had completed the anger-management and substance-abuse services, and his sobriety date was July 12, 2024. (Tr. 49). At the time of trial, Father was living with his grandfather and was looking for his own home.

**{¶ 14}** Father was permitted weekly visits with the child, and although he was initially consistently attending the scheduled visits and was appropriate with N.C., he became inconsistent in his attendance. In December 2023, the agency filed a case-plan amendment, recommending suspension of his visits after Father put the child at risk while engaging in aggressive behavior toward an agency worker. Father's supervised visitation was reinstated in October 2024, with the condition that they be supervised by the agency at the Jane Edna Hunter Building. Following this reinstatement, Father interacted appropriately with N.C. during the first visit.

The second visit, on October 31, 2024, started off well, and Father brought N.C. gifts since it was the day before N.C.'s birthday. Towards the end of the visit, N.C. started to have a tantrum and started to hit Father. Father tried to restrain N.C., which Whatley testified was not working. Whatley suggested Father try walking with N.C. Father told her that she was "overstepping [her] boundaries" and "[her] job was to sit there and observe, to not talk to him." (Tr. 51.) N.C. then hit Father again, which caused Father to hit N.C. Whatley testified, "During this time[,] [Father] was red. I told [him], I said, you cannot hit him. He said, 'I can hit him. I can whoop my son. He should not be hitting.' I agreed. I said he does have to learn how to regulate his emotions, but he's 2. This is only the second visit. He doesn't see you as an [authoritative] figure. And [Father] told me I could write in my case notes that he hit his child." (Tr. 52.)

{¶ 15} This interaction led Whatley to conclude that Father had not derived sufficient benefit from his case plan-services to achieve reunification. Whatley explained,

> [Father] was red. He was angry. When [N.C] hit him, it angered him as if maybe an adult had hit him. Like I said, this was the first time he had experienced [N.C.]'s temper tantrums, at least a year because their visits had been suspended for about a year before they started and his first thought was, okay, let me restrain you. Let me hold your arms. Let me hold your head. Let me hold your chest. [N.C.] was hitting and kicking and you should not hit, but also I was trying to explain to him like he shouldn't hit his father. In his mind it's not like I'm going here to beat my father up. He's hitting somebody that is holding him and he doesn't want to be held, and not only that, [Father] was angry was my concern. I was concerned that [Father] thought it was appropriate to hit a 2-year-old. Like he's seeing no problem in hitting him.

(Tr. 53-54.) Whatley further explained that "a 2-year-old got [Father] that angry, a 2-year-old that he hadn't seen before two weeks prior in almost a year, that you snap and like I say, he was turning red. He was frustrated. You could not redirect him. I even told [Father], I said, if you don't calm down, I'll have to end your visit. He's like, you're not ending anything. He was frustrated. He was angry. Like he was red." (Tr. 54.)

{¶ 16} At the time of trial, concerns remained regarding the ongoing relationship between Mother and Father. According to Whatley, during her first conversation with Mother in July 2024, they discussed the case-plan services. Mother inquired why the agency was proceeding with permanent custody even though she completed all her services. Whatley replied to Mother, "[T]he concern is that you and [Father] are still together[.]" (Tr. 58.) Mother replied, "[W]ell, we're not together anymore. We haven't been together in over a month" even though Mother and Father were spotted leaving court together. (Tr. 58.) When Whatley spoke with Father, he "also disclosed that him and [Mother] was not together at all." (Tr. 58-59.) Whatley testified that Grandfather and additional sources of information, including pictures of Mother and Father together on social media, revealed inconsistencies and further supported the agency's concerns about Mother's and Father's honesty as to their ongoing relationship.

{¶ 17} In addition, despite Mother's and Father's claims that they were no longer involved, the two of them "completed a couple's Building Healthy Relationships course through Beech Brook" in September 2024. (Tr. 56.) Whatley

explained that "victims are not allowed to do counseling together or any type of programming when they're, you know, in the same couple of domestic violence" and confirmed with Beech Brook staff that it was in fact a couple's course. (Tr. 59.) A Beech Brook Family Life Educator confirmed that Mother and Father attended the Healthy Relationship class together and "presented themselves together." (Tr. 108.)

{¶ 18} Because of both Mother's and Father's demonstrated inability to deal with the child's behaviors during visits (Mother by disengaging with the child and Father by becoming enraged and hitting the child), coupled with the history of domestic violence between Mother and Father and the dishonesty as to their relationship status, the agency was concerned about the prospect of N.C. returning to Mother's care and her ability to keep N.C. safe. Whatley testified that neither Mother nor Father were in a position to provide N.C. with a safe, stable, and permanent home, nor was it anticipated that either would be in a position to do so within a reasonable time.

{¶ 19} Mother's therapist ("Therapist") testified that she had been working with Mother for approximately one year. According to Therapist, Mother was diagnosed with schizophrenia and has made "significant progress" in the sense that she "was no longer symptomatic," she has maintained her prescription, and is "more stable than she was when she came into [the] agency." (Tr. 95.) Therapist did not answer questions about Mother's treatment sessions as "those are privileged." (Tr. 95.) Therapist could not offer an opinion on Mother's ability to safely parent N.C. and would only state that Mother was not a danger to herself. Therapist

acknowledged that she had expressed concerns about the domestically violent nature of Mother's relationship with Father until they were no longer living together and stated that Mother's relationship with Father would be a threat to her safety "if she kept engaging in that relationship[.]" (Tr. 104.) Therapist believed that Mother was no longer involved with Father but admitted that this belief was based solely on Mother's claims in that regard. Therapist acknowledged that Mother had previously claimed to have separated from Father only to later admit to Therapist that they were still together.

{¶ 20} Grandfather testified that he has been taking care of N.C. for approximately eight months and the living situation was "going really well." (Tr. 112.) According to Grandfather, he had "an open-door policy" for Mother's visits, with the child. (Tr. 116.) Grandfather further testified that he did not have any concerns regarding the interactions between Mother and N.C. during their visits, but a "few things came to [his] attention[,]" such as Mother's lack of engagement with N.C. (Tr. 113.) Additionally, Grandfather testified that he had concerns about Mother continuing a relationship with Father because of the inconsistency of the relationship, N.C.'s safety, and Mother's safety due to abuse that he described as "verbal, physically, and everything else in between." (Tr. 117.) At the time of trial, Grandfather thought that Mother and Father's relationship had been dissolved but did not "know for sure." (Tr. 114.) As recently as September 2024, Grandfather observed Mother on the phone with Father during Mother's visits and asked her what she was doing and when she was "coming back[.]" (Tr.

114.) When asked by the prosecuting attorney for CCDCFS if Grandfather was ever approached about the possibility of taking legal custody of N.C., Grandfather replied "yes" and that he "decided that the best thing to do for [N.C.] would be [for him to be N.C.'s] sole protector so [he] could be in between [N.C.] and anything else that might come towards him by the way of harm."(Tr. 118.)

{¶ 21} The guardian ad litem ("GAL") recommended permanent custody for N.C. The GAL acknowledged that "there is no more time" for an extension of temporary custody and noted that "every witness that was here today has at some point the same concerns which is related to [Mother's] ability to protect herself and [N.C.]" (Tr. 121.) The GAL further commented that "this [relationship] concern has been going on and on since the starting of this proceeding because [Manuel] testified here, we started with a complaint for domestic violence between them, and those concerns have been going on and on up to today. So I would not be able to support any legal custody to [Mother]." (Tr. 121.)

{¶ 22} Following the conclusion of trial, the court issued a decision in which it terminated Mother's parental rights and ordered N.C. be placed in the permanent custody of CCDCFS. In its judgment entry, the court found by clear and convincing evidence that N.C. cannot or should not be placed with either parent and it is in N.C.'s best interest to be placed in the permanent custody of CCDCFS. The court further found that reasonable efforts were made to prevent N.C.'s removal, including Mother's referrals for "parenting, mental health, and domestic violence. The [F]ather was referred for substance abuse, basic needs, and anger management."

(Journal entry, Dec. 9, 2024.) The court adopted the permanency plan, which is adoption.

{¶ 23} It is from this order that Mother now appeals, raising two assignments of error, which shall be addressed together for ease of discussion.

## II. Law and Analysis

{¶ 24} Within Mother's assigned errors, she challenges the juvenile court's award of permanent custody to CCDCFS. Mother argues that the juvenile court's decision to terminate her parental rights and grant permanent custody of N.C. was against the manifest weight of the evidence and the court's decision was not in N.C.'s best interest because she completed her case plan and "is ready and willing to take care of N.C." (Mother's brief, p. 18.)

### A. Standard of Review

{¶ 25} At the outset, we recognize that the right to raise one's own child is "an 'essential' and 'basic civil right.'" *In re Murray*, 52 Ohio St.3d 155, 156 (1990), quoting *Stanley v. Illinois*, 405 U.S. 645, 651 (1972). "Parents have a 'fundamental liberty interest' in the care, custody, and management of the child." *Id.*, quoting *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). This right, however, is not absolute. "'The natural rights of a parent are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'" *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979), quoting *In re R.J.C.*, 300 So.2d 54, 58 (Fla.App. 1974).

{¶ 26} The Supreme Court of Ohio has recently provided guidance on the standard of review in permanent custody cases. The Court held:

> [T]he proper appellate standards of review to apply in cases involving a juvenile court's decision under R.C. 2151.414 to award permanent custody of a child and to terminate parental rights are the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards, as appropriate depending on the nature of the arguments presented by the parties.

*In re Z.C.*, 2023-Ohio-4703, ¶ 18.

{¶ 27} Mother bases her arguments on the manifest-weight-of-the-evidence standard. The *In re Z.C.* Court reexplained the manifest-weight-of-the-evidence standard as follows:

> When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. [*Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20.] "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Id*. at ¶ 21. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). "'If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.'" *Id*. at fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191-192 (1978).

*Id*. at ¶ 14.

## B. Permanent Custody — R.C. 2151.414

{¶ 28} R.C. 2151.414 sets forth a "two-prong analysis to be applied by a juvenile court in adjudicating a motion for permanent custody." *In re B.P.*, 2023-Ohio-1377, ¶ 27 (8th Dist.), citing *In re S.C.*, 2018-Ohio-2523, ¶ 20 (8th Dist.).

> The first prong authorizes the juvenile court to grant permanent custody of a child to the public agency if, after a hearing, the court determines, by clear and convincing evidence, that any of the following factors apply: (a) the child is not abandoned or orphaned, but the child cannot be placed with either parent within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned, and there are no relatives of the child who are able to take permanent custody; (d) the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period; or (e) the child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

*Id.*, citing R.C. 2151.414(B)(1)(a)-(e).

{¶ 29} The second prong of the analysis requires the juvenile court to determine, by clear and convincing evidence, that granting permanent custody to the agency is in the best interest of the child. R.C. 2151.414(B)(1). "'Clear and convincing evidence is that measure or degree of proof which is more than a mere "preponderance of the evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *In re Z.C.*, 2023-Ohio-4703, at ¶ 7, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

## 1. The R.C. 2151.414(B)(1) Factors and R.C. 2151.414(E)

{¶ 30} As an initial matter, we must address CCDCFS's acknowledgement that the juvenile court erroneously found that N.C. "has been in temporary custody of a public children services agency or private child placing agency for twelve or more months of a consecutive twenty-two-month period" as set forth in R.C. 2151.414(B)(1)(d). CCDCFS contends that this finding is erroneous because the permanent custody motion was filed in September 2023, which was approximately nine months after N.C. was originally removed in November 2022. *See In re C.W.*, 2004-Ohio-6411, ¶ 26 (where the Ohio Supreme Court held that "the time that passes between the filing of a motion for permanent custody and the permanent-custody hearing does not count toward the 12-month period set forth in R.C. 2151.414(B)(1)(d))." Nevertheless, CCDCFS maintains that this is not reversible error because the court also included appropriate findings in satisfaction of R.C. 2151.414(B)(1)(a) through its findings pursuant to R.C. 2151.414(E). We agree.

{¶ 31} In support of its position, CCDCFS relies on this court's opinion in *In re T.T.*, 2024-Ohio-2914 (8th Dist.). In this case, the juvenile court also erroneously granted permanent custody to CCDCFS on the basis set forth in R.C. 2151.414(B)(1)(d). We found that the error was harmless at best. *Id.* at ¶ 14, citing *In re R.D.W.*, 2021-Ohio-4304, ¶ 25-26 (8th Dist.); *see also In re T.J.*, 2024-Ohio-5914, ¶ 43 (8th Dist.). We stated, "Although the trial court made an erroneous finding, 'that does not preclude us from finding that the trial court's judgment

[awarding permanent custody to the agency] is nevertheless correct.'" *Id.* at ¶ 17, quoting *In re J.T.*, 2004-Ohio-5797, ¶ 36 (2d Dist.).

{¶ 32} In reaching this conclusion, we noted that CCDCFS did not rely on R.C. 2151.414(B)(1)(d) in its motion for permanent custody. Rather, CCDCFS asserted that "'the condition listed in R.C. 2151.414(B)(1)(a) exists and that one or more of the factors listed in R.C. 2151.414(E) apply to the parents of the [child] at issue.'" *Id.* at ¶ 15. And consistent with CCDCFS's reliance on R.C. 2151.414(B)(1)(a), the juvenile court found under R.C. 2151.414(E) that "'the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent,' and the juvenile court found multiple factors under R.C. 2151.414(E) were met, including R.C. 2151.414(E)(1) and (E)(4)." *Id.* at ¶ 16.

{¶ 33} Likewise, in the instant case, CCDCFS did not rely on R.C. 2151.414(B)(1)(d) in its motion for permanent custody. Rather, CCDCFS asserted that "the condition listed in R.C. 2151.414(B)(1)(a) exists and that one or more of the factors listed in R.C. 2151.414(E) apply to the parents of the child at issue." (CCDCFS motion, Sept. 9, 2022.) And consistent with CCDCFS's reliance on R.C. 2151.414(B)(1)(a), the juvenile court found under R.C. 2151.414(E) that "the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent," and the juvenile court found multiple factors under R.C. 2151.414(E) were met, including R.C. 2151.414(E)(1), (E)(4), (E)(14), (E)(15), and (E)(16). (Journal entry, Dec. 9, 2024.) Therefore, just as in *In*

*re T.T.*, we also find that while "the trial court made an erroneous finding, 'that does not preclude us from finding that the trial court's judgment [awarding permanent custody to the agency] is nevertheless correct.'" *Id.* at ¶ 17, quoting *In re J.T.* at ¶ 36.

{¶ 34} Having determined that the juvenile court made its findings under R.C. 2151.414(B)(1)(a) that "the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents," we now look to R.C. 2151.414(E), which enumerates several factors for the court to consider in cases where R.C. 2151.414(B)(1)(a) applies. *In re D.H.*, 2022-Ohio-2780, ¶ 28 (8th Dist.), citing *In re L.J.*, 2022-Ohio-2278, ¶ 43 (8th Dist.); *see also In re L.C.*, 2022-Ohio-1592, ¶ 47 (8th Dist.). Under R.C. 2151.414(E), if the court determines, by clear and convincing evidence, that one or more of the (E)(1)-(16) factors exist, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent.

{¶ 35} Here, the trial court found the presence of three (E) factors — (E)(1), (E)(14), and (E)(16), which provide in pertinent part:

> If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A) (4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:
>
> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.

. . .

(14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.

. . .

(16) Any other factor the court considers relevant.

R.C. 2151.414(E).

### Failure to Remedy — R.C. 2151.414(E)(1); Unwillingness to Provide for Children's Needs — R.C. 2151.414(E)(14); and Other Relevant Factors — R.C. 2151.414(E)(16)

{¶ 36} We address the R.C. 2151.414(E) factors together as they are interrelated. Here, the court found that Mother failed to remedy the concerns leading to the N.C.'s removal, stating that this "[a]pplies to Mother's housing and Mother's failure to be honest about Father's continuous involvement in her life"; demonstrated an unwillingness to provide for N.C., stating that "Mother puts value and/or control Father has over her making decisions in the best interest of herself or her child's safety"; and Mother failed to demonstrate a benefit from the services, stating that "Mother has failed to show the ability to make independent decisions to keep [N.C.] and herself safe. Maternal Grandfather had an open door policy including invites to vacations, etc. for Mother. Mother prioritizes relationship with [F]ather over these opportunities to spend time with her child. Mother has been dishonest with family, service providers, and CCDCFS workers regarding [F]ather's role and significance in her life." (Journal Entry, Dec. 9, 2024.)

{¶ 37} Mother argues that CCDCFS has not met its burden because she completed her case plan. A parent's successful completion of the terms of a case plan, however, "is not dispositive on the issue of reunification." *In re C.C.*, 2010-Ohio-780, ¶ 25 (8th Dist.). When "making custody determinations, the trial court's principal concern is the children's best interest. While completing the case plan may be in parent's best interest, this is not a factor in determining what is in the children's best interest." *In re D.T.*, 2014-Ohio-4818, ¶ 23 (8th Dist.), citing *In re M.J.M.*, 2010-Ohio-1674, ¶14 (8th Dist.). Indeed, "[a] parent can successfully complete the terms of a case plan yet not substantially remedy the conditions that caused the children to be removed — the case plan is simply a means to a goal, but not the goal itself. Hence, the courts have held that the successful completion of case-plan requirements does not preclude a grant of permanent custody to a social services agency." *In re C.C.* at ¶ 25, citing *In re J.L.*, 2004-Ohio-6024, ¶ 20 (8th Dist.); *In re Mraz*, 2002-Ohio-7278 (12th Dist.).

{¶ 38} Here, the record established that, even though Mother had been referred to services and completed some of her referrals to address her issues with mental health, pending criminal matters, and parenting, Mother failed to demonstrate a benefit from those services. Both Manuel and Whatley testified that concerns remained regarding the ongoing relationship between Mother and Father. Manuel was concerned that Mother could not make good decisions for N.C. with Father around due to the nature of the domestically violent relationship between Mother and Father. And according to Whatley, both Mother and Father denied

being in a relationship together even though they were spotted leaving court together and had completed a couple's course, which she testified was not allowed for victims who were in a relationship with their domestically violent partner. Furthermore, Grandfather and additional sources of information, including social media posts, revealed inconsistencies and further supported the agency's concerns about Mother's and Father's honesty as to their ongoing relationship. Lastly, in March 2024, Manuel had an unannounced visit at Mother's home. When Manuel entered the home, Mother denied that Father was present. However, Manuel found Father hiding in a bedroom closet. Father then "popped out of the closet, and he started being really aggressive, calling [Manuel] out of [her] name, telling [her] to get the F out using expletives, and [they] had a whole little argument. His face was beet red. He was hollering and [she] had finally experienced what [she] had previously been told [herself].." (Tr. 25.) Thus, the record is clear that Mother continued to associate throughout the proceedings with Father, her domestically violent partner, while attempting to conceal this fact.

{¶ 39} The record also supports the court's findings that Mother prioritizes her relationship with Father over opportunities to spend time with her child. Grandfather testified that he has been taking care of N.C. for approximately eight months and the living situation was "going really well." (Tr. 112.) Grandfather had "an open-door policy" for Mother's visits with N.C. (Tr. 116.) The record reveals that Mother did not exercise these open-door visits and, instead, requested that her weekly visits with N.C. at her Father's home be reduced to biweekly visits at the

library. Additionally, Grandfather had concerns about Mother continuing a relationship with Father because of the inconsistency of the relationship, N.C.'s safety, and Mother's safety due to abuse that he described as "verbal, physically, and everything else in between." (Tr. 117.) As recently as September 2024, Grandfather observed Mother on the phone with Father during Mother's visits and asked her what she was doing and when she was "coming back[.]" (Tr. 114.)

{¶ 40} Lastly, the record demonstrates that Mother also failed to resolve her housing issue in the two years since N.C.'s removal. Whatley testified that while Mother's apartment was appropriate, the building it was in looked "very condemned" and posed a safety risk. (Tr. 55.) According to Whatley, there are "several boarded up windows. . . . Walking through it was multiple vacant apartments with doors open. The stairs, it was like glass, dirt. It looked condemned until you got into her apartment." (Tr. 55.)

{¶ 41} The foregoing facts support the juvenile court's findings in relation to the statutory factors. Therefore, we find that the first prong of the permanent-custody analysis was supported by clear and convincing evidence and was not against the manifest weight of the evidence. The record clearly and convincingly supports the juvenile court's determination under R.C. 2151.414(B)(1)(a) that N.C. cannot or should not be placed with Mother within a reasonable time.

{¶ 42} Having found that the juvenile court properly determined that at least one of the R.C. 2151.414(B)(1) factors applies by clear and convincing evidence, we must next determine whether the juvenile court appropriately found by clear and

convincing evidence that granting permanent custody to CCDCFS is in N.C.'s best interest under R.C. 2151.414(D).

## 2. R.C. 2151.414(D)(1) — Best Interest Determination

{¶ 43} The R.C. 2151.414(D)(1)(a)-(e) factors include (a) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers, and out-of-home providers; (b) the child's wishes, as expressed directly by the child or through the child's guardian ad litem; (c) the child's custodial history; (d) the child's need for a legally secured permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (e) whether any of the factors set forth in R.C. 2151.414(E)(7)-(11) apply. A juvenile court must consider each of the R.C. 2151.414(D)(1) factors when making a permanent-custody determination, but no one factor is given greater weight than the others. *In re Schaefer*, 2006-Ohio-5513, ¶ 56. Only one of the factors set forth in R.C. 2151.414(D)(1), however, needs to be resolved in favor of permanent custody. *In re D.H.*, 2022-Ohio-2780, at ¶ 46 (8th Dist.), citing *In re G.W.*, 2019-Ohio-1533, ¶ 72 (8th Dist.).

{¶ 44} We focus our review on R.C. 2151.414(D)(1)(a) and (b). It is clear from the record that the court considered these factors and found in favor of permanent custody. The court found:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child. *The child is placed with maternal grandfather.*

 (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child. *The child is too young to express wishes. The GAL recommendation is for permanent custody.*

(Emphasis in original.) (Journal entry, Dec. 9, 2024.)

{¶ 45} In the matter before us, the testimony at trial established that Mother was permitted weekly visits with N.C. and, while these visits went well, there was a concern about Mother's lack of bonding with N.C. during these visits. Grandfather indicated that Mother did not interact with N.C. as much as he believed she should. Mother's visits never progressed beyond weekly supervised visits, and in September 2024, Mother's visits were reduced from weekly to biweekly to accommodate her request that Whatley supervise the visits at the library rather than attending the weekly visits at Grandfather's house, despite Grandfather's open-door policy for visits. During the most recent visit prior to trial, Mother was frustrated by N.C.'s behaviors and "kinda sat down at the table for maybe 20 to 25 minutes not really engaging with [N.C.]," leaving Whatley to attend to N.C.'s care during this time. Lastly, the GAL noted that N.C. was comfortable and well-bonded with Grandfather, who testified that he felt "the best thing to do for [N.C.] would be [for him to be N.C.'s] sole protector so [he] could be in between [N.C.] and anything else that might come towards him by way of harm." (Tr. 118.) Given the nature of the evidence, it was within the discretion of the court to determine that this factor weighs in favor of permanent custody.

{¶ 46} Additionally, the GAL recommended permanent custody, acknowledging at trial that "there is no more time" for an extension of temporary custody and noted that "every witness that was here today has at some point the same concerns which is related to [Mother's] ability to protect herself and [N.C.]" (Tr. 121.) The GAL stated that "this [relationship] concern has been going on and on since the starting of this proceeding because [Manuel] testified here, we started with a complaint for domestic violence between them, and those concerns have been going on and on up to today. So I would not be able to support any legal custody to [Mother]."[4] (Tr. 121.)

{¶ 47} In light of the foregoing, we find that there is clear and convincing evidence in the record to support the court's determination that permanent custody to CCDCFS is in N.C.'s best interest. Accordingly, we find that the court's decision to grant permanent custody to CCDCFS is not against the weight of the evidence as Mother contends.

{¶ 48} Therefore, Mother's first and second assignments of errors are overruled.

{¶ 49} Judgment is affirmed.

---

[4] CCDCFS also argues that while the trial court did not explicitly include best interest findings in relation to R.C. 2151.414(D)(2) within its entry, the evidence at trial plainly establishes each of the factors listed in that section such that a finding of permanent custody was statutorily mandated. In determining whether permanent custody is in the best interest of the child, however, the juvenile must court consider the relevant factors set forth in either R.C. 2151.414(D)(1) or (D)(2). *In re U.B.*, 2025-Ohio-1265, ¶ 27 (8th Dist.). Because we have found that permanent custody is in N.C.'s best interest under R.C. 2151.414(D)(1), we need not address R.C. 2151.414(D)(2).

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, JUDGE

EMANUELLA D. GROVES, P.J., and
SEAN C. GALLAGHER, J., CONCUR